UNITED STATES of America,
Plaintiff,

v.

Nicholas G. MIHALOPOULOS et al.,
Defendants.

Crim. No. 248-63.

United States District Court
District of Columbia.

April 30, 1964.

William H. Collins, Jr., Asst. U. S. Atty., for plaintiff.

Milton C. Gelenian, Washington, D. C., for the defendant Mihalopoulos.

HOLTZOFF, District Judge.

This case presents a problem regarding the application of the rule which at the trial of a criminal proceeding bars the admission in evidence of a defendant's confession or incriminating statement if made during a period of unnecessary delay between the arrest and his appearance before a committing magistrate. Specifically the question is, what constitutes "unnecessary delay" within the meaning of that doctrine as formulated in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

The defendant was found guilty on charges of housebreaking and larceny. The case is now before the Court on his motion for a new trial. The principal point raised is the admissibility of a written confession, which was introduced in evidence over the objection of defense counsel. In view of its importance both in the trial of criminal cases as well as in the administration and enforcement of the criminal law, the Court has examined and explored the subject with some degree of elaboration.

The defendant Mihalopoulos was indicted together with co-defendants Antonelli and Berman, on charges of breaking into a tomato canning plant of Pete Pappas and Sons, Inc., and stealing a sum of money in excess of $1300. The Government contended that the facts were as follows. The defendant, who was a second cousin by marriage of Gus Pappas, the owner and operator of the plant, informed his two co-defendants that Pappas kept large sums of money in the building. The three men drove to the premises on the night of January 24–25, 1963 in a taxicab owned and operated by Antonelli. The two co-defendants then broke into the plant, found a safe in one of the offices, smashed and broke it open, and took a sum of money amounting to over $1300. In the meantime the defend-

ant remained in the taxicab, having been instructed by his co-defendants to watch and to signal if any suspicious person appeared while they were perpetrating their activities inside the building. Later they divided the loot, the defendant receiving a sum of $195.

The defendant Mihalopoulos alone stood trial. Each of the two co-defendants had pleaded guilty. Berman has not as yet been sentenced. Antonelli received a suspended prison sentence and was placed on probation. He had related the entire story to the authorities and testified as a Government witness at this trial.

Antonelli was the principal witness for the Government. His testimony may be briefly summarized as follows. He and Berman met the defendant at a restaurant on 14th Street in the Northwest Section of Washington, at about 11:45 p. m., on January 24. The three drove in Antonelli's taxicab to the Pappas plant, which is located in Southeast Washington. The defendant had previously informed his companions that Pappas generally kept between $35,000 and $50,000 in a desk drawer. They parked in an alley near the plant. The defendant was instructed by his two associates to stay in the cab, keep watch and give a pre-arranged signal in the event that any suspicious person appeared in the vicinity. The two co-defendants then broke into the building by using a hacksaw to open the door, and made their way upstairs into the office. They ransacked all of the desks, but found no money. Finally they observed a safe. Antonelli then returned to the cab, took out some tools, including a large sledge hammer, and carried them back upstairs. He broke the dial on the safe with the sledge hammer, while Berman used an instrument known as a "punch". The safe door was opened in this manner. They found a number of large envelopes filled with currency, as well as a metal cash box containing more money. They took all of the money. According to Antonelli the total amount stolen was $1385. They then returned to the taxicab and immediately drove to

Berman's house, located in a nearby suburb in Maryland, where they went into the basement and distributed the money among themselves, as well as giving some to a woman who lived in the house. Berman and Antonelli gave $195 to the defendant, while each of them retained $545. The next day Berman and Antonelli went to the defendant's apartment and instructed him to say if the police picked him up, that he had been a passenger in Antonelli's cab. The defendant was arrested late in the evening of Saturday, January 26, while Antonelli and Berman were taken into custody early on the following morning. Out of the proceeds of the crime, Antonelli returned to the police the sum of $300, and Berman gave back $210.

Antonelli's testimony thus clearly implicated the defendant as an aider and abetter. His credibility as a witness was, however, manifestly vulnerable. In due course in its instructions to the jury, the Court stated that according to his own testimony, Antonelli was an accomplice and that an accomplice's testimony must be received with caution and scrutinized with care. Thus far, there was very little corroboration of Antonelli's testimony insofar as it implicated the defendant.

Government counsel then offered in evidence a written-confession made by the defendant to the police after his arrest. This confession related the events in detail and coincided in all essentials with Antonelli's version. The defendant's counsel objected to its introduction on the ground that it was made during a period of alleged unnecessary delay between the defendant's arrest and his appearance before a committing magistrate and, therefore, was barred by the rule of the case of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. The objection was overruled. The point has now been renewed on the defendant's motion for a new trial and forms the subject matter of this opinion.

When the objection to the admissibility of the confession was interposed, the Court conducted a preliminary hearing

out of the presence of the jury. The circumstances under which the confession was made were explored in great detail. The pertinent facts brought out may be summarized as follows.

Sergeant Gray of the Safe Squad of the Metropolitan Police Department, arrived at the Pappas plant on the morning of January 25. An investigation of the neighborhood was made and information was obtained from one Nelson Dyer, who lived in the vicinity, that at about the preceding midnight he had observed a taxicab parked near the establishment and that the name "Antonelli" was printed on the vehicle. This clue apparently gave the police a starting point, especially as Antonelli was well known to them. That afternoon Antonelli was asked to come down to the Safe Squad office. He stated that he had driven his cab in the neighborhood with a passenger, but he did not at that time confess to any connection with the crime. He then left. Apparently learning from Antonelli the identity of his passenger, the police endeavored to locate the defendant and ascertained that he was in the habit of frequenting a restaurant on 14th Street. On Saturday, January 26, Sergeant Gray and Sergeant Smith went to that restaurant dressed in plain clothes, and waited. At about 1:30 p. m. the defendant appeared. The two officers, after a discreet interval, approached and asked him whether he had been a passenger in a cab on the night of January 24, and had been taken to the Southeast section of the city. His reply was in the affirmative. He explained that his intention had been to meet a girl in that part of town, but that he changed his mind and asked the cab driver to return him to the neighborhood of Thomas Circle. Apparently the police were not convinced by his reply or impressed by Antonelli's previous story to a similar effect.

Sergeant Gray then said that he would like to talk to the defendant further about Antonelli and invited him to go to Police Headquarters for that purpose, but added that he was not under arrest and that he did not have to come if he did not want to. The defendant responded that he was a good American, desired to cooperate with the police and would go with them. The three then drove to Police Headquarters in an unmarked Police Department automobile. The defendant was not handcuffed, and was not under restraint of any kind. They arrived at Police Headquarters about 2:30 p. m. and proceeded to the office of the Safe Squad. This office is a large room with a number of desks assigned to various members of the Squad. The door was open. During the afternoon and evening other members of the Squad came and went from time to time in connection with other business. The defendant was not placed in a cell at any time. He was questioned in detail concerning his ride in Antonelli's cab, and he repeated the circumstances with greater particularity. These conversations continued on and off until about 4:00 o'clock. During that interval the defendant was again told that he was not under arrest and was free to go if he wished. A couple of times he left the office unaccompanied and unattended to go to the rest room located elsewhere in the building, and on another occasion he left alone to get a package of cigarettes. He was allowed to use the telephone. He was advised of his rights. At one time during the afternoon, the defendant decided to depart, got up and walked out. Sergeant Gray testified that he and his associate did not try to follow or prevent him from leaving, because he was not under arrest. Apparently, however, the defendant changed his mind, because he shortly returned to the Safe Squad office.

At about 4:00 o'clock Sergeant Gray telephoned to Gus Pappas and invited him to come down for an additional interview. Pappas arrived at about 4:30 p. m. and was surprised to see the defendant, his distant cousin by marriage, at Police Headquarters. Pappas asked the defendant what he was doing there and the defendant gave a noncommittal answer. Pappas and the defendant then had a long conversation in Greek, which was their native tongue. During this protracted conference, Pappas suggested to the de-

fendant that they might get up and go, but the defendant seemed reluctant to leave.

At the suggestion of Sergeant Gray, the defendant agreed to submit to a lie detector test. For that purpose he was conducted to the office of the General Assignment Squad, where the polygraph apparatus was located. It was then about 7:30 p. m. In about two hours the defendant returned to the Safe Squad office, the lie detector test having been administered in the interim. Sergeant Gray discussed the results with the defendant and Pappas. Pappas testified that in the course of the conversation in Greek, he told the defendant that if in fact the defendant had participated in the crime, he would like to know it from the defendant himself, rather than to hear about it first from some outsider.

At about 10:15 p. m. the defendant began to weep and speaking in Greek admitted to Pappas his complicity in the crime. Pappas orally translated this admission to the police. The defendant then was asked by the police whether he was willing to make a written statement, but was also informed that he did not have to do so. The defendant replied that he would like to make such a statement. Sergeant Smith then transcribed the statement directly on the typewriter at the defendant's dictation. Shortly after the dictation began, Pappas went out to a nearby restaurant and brought back sandwiches and coffee. The dictation was suspended while Pappas, the defendant and the two police officers partook of the refreshments. It was then resumed. This procedure consumed some time, as the statement narrated the events in great detail and consists of three full single-spaced typewritten pages. After the dictation was completed, Sergeant Smith slowly read the statement aloud. A carbon copy was given to the defendant in order that he might follow the reading. Other carbon copies were handed simultaneously to Pappas and Sergeant Gray. When the reading started the defendant was instructed to interrupt at any time and indicate any changes or corrections

that he desired to make. After the reading was finished, the defendant signed the statement and Sergeant Gray, Sergeant Smith and Pappas signed as witnesses. The police officers then formally announced to the defendant that he was under arrest on charges of housebreaking and larceny. This was at about 12:20 a. m.

Sergeant Gray communicated with an Assistant United States Attorney and the latter in turn succeeded in reaching one of the Judges of the Municipal Court (now known as the Court of General Sessions) on the telephone and requested him to come to the Courthouse to hold a hearing. Presumably the Judge got up out of bed in the middle of the night and made his way to the Courthouse, arriving there about 2:05 a. m. A hearing was conducted and the defendant was bound over for a later appearance. The Judge fixed bond, which was promptly given. Incidentally Pappas paid the premium to the bondsman.

On cross-examination Sergeant Gray stated that the defendant had been free to leave at any time up to 10:15 p. m., and that if he had tried to depart, the police would not have obstructed him in any way. He explained that until the oral confession was made they felt that they did not have sufficient evidence justifying an arrest. He candidly added, however, that if the defendant had tried to leave at any time after 10:15 p. m., when he made his oral confession, they would have prevented him from doing so, and would have immediately placed him under formal arrest.

The testimony of Sergeant Gray and Pappas was not contradicted in any way. They were not impeached on cross-examination. The defendant did not testify at the preliminary hearing, which took place out of the presence of the jury, although the Court in order to avoid any possible misunderstanding advised the defendant's counsel that at such a preliminary hearing, the defendant might testify without waiving his privilege against self-incrimination, and would not be subject to cross-examination concerning the facts of the offense or any other

matter except those regarding which he had testified and, that as a result of doing so, he would not thereafter be compelled to testify before the jury. The defendant, however, did not take advantage of this opportunity. While no adverse inference may be drawn from that fact, nevertheless, an opposite inference is not justified either and the Court may not assume that if the defendant had testified at tthe preliminary hearing, he would have contradicted any part of the testimony adduced in behalf of the Government. The Court finds the testimony given by Sergeant Gray and Pappas to be true.

The Court found as a fact on the basis of Sergeant Gray's testimony that the defendant must be deemed to have been in police custody from 10:15 p. m., since he would not have been free to leave Police Headquarters after that time had he tried to do so. On the other hand, he was not under arrest previously to 10:15 p. m. The Court admitted the confession, having concluded that there was no unnecessary delay in taking the defendant before a committing magistrate between the time of arrest and the signing of the written statement.

The defendant later took the witness stand before the jury. He admitted that he was in the taxicab with Antonelli and Berman on the night of the offense, but said that he was intoxicated, fell asleep and did not know what happened or where Antonelli and Berman went until he awoke in Berman's house in the early morning hours. He also testified that he signed the confession before it was read and before he realized its contents and that subsequently it was too late to do anything about it. The jury found him guilty.

■ While in its ultimate analysis the question to be determined is of a narrow scope, it has so many ramifications and exerts such a weighty effect on the administration of criminal law and the trial of criminal cases, that in order to deal with it adequately it seems necessary first to place it in its setting. Confessions play an important and vital part in criminal law. If freely and willingly made, a confession is of high probative value, because ordinarily an innocent person does not confess to the commission of a crime. In spite of occasional skepticism on the part of some who have had limited practical contact with the realities of criminal cases, such confessions are very frequent. They may be motivated in different ways. At times the accused makes a confession in the hope of securing some degree of leniency,—a hope that is generally not misplaced. Such a confession may be made at the very threshold immediately after arrest, or it may be forthcoming after an interrogation as a result of which the accused perceives that the prosecution has a strong case against him and that his struggles at exculpating himself have been unsuccessful. At other times the accused makes a confession as a result of a psychological urge or compulsion to unburden himself of a sense of guilt.[1] Such a mental operation is well recognized by students of the human mind and human emotions. At times a confession may be the result of remorse or contrition, or a desire to make amends. Confessions should be encouraged. They are approved and sanctioned by religion.

■ It is indeed true that false confessions, though highly infrequent, are not entirely unknown. A chivalrous desire to shield someone else, or an effort to divert attention from a more serious offense that the suspect actually committed, have on rare occasions resulted in untrue confessions. Persons with a psychopathic or unstable personality have been known to imagine that they committed a crime that they have read or heard about. In order to eliminate the possibility of a false confession, the law does not permit a conviction on the basis of an uncorroborated confession standing alone. It requires corroboration either by separate proof of the *corpus delicti* or by independent evidence sustaining the trustworthiness of the confession, Opper v.

1. Wigmore, The Science of Judicial Proof, Section 276.

United States, 348 U.S. 84, 92–93, 75 S. Ct. 158, 99 L.Ed. 101; Smith v. United States, 348 U.S. 147, 152–154, 75 S.Ct. 194, 99 L.Ed. 192; Smoot v. United States, 114 U.S.App.D.C. 154, 312 F.2d 881.

■■ There are two limitations on the admissibility of a confession at the trial of a criminal case. The first and fundamental restriction is that a confession in order to be admissible must be voluntary. It must not have been brought about, in whole or in part, either by threats or by any degree of coercion, or by inducement, whether the coercion consists of physical torture or abuse, or of mental or moral pressure. To obtain a confession in such a manner is contrary to the instincts of humanity and does not accord with civilized standards of law enforcement. Such measures create feelings of abhorrence and aversion in the mind of modern Western man. This principle is, therefore, founded on abstract justice. Moreover, the reliability of a confession so obtained is questionable. While this rule of exclusion originated in the law of evidence, it has been elevated to the dignity of a Constitutional principle as an element of due process of law under the Fifth and Fourteenth Amendments.

■■ The second limitation on the admissibility of confessions is that involved in the instant case. It has been developed only during the past decade and is entirely a rule of practice confined to the Federal courts. It does not involve any Constitutional principle, especially as preliminary hearings do not form an element of Constitutional due process of law and are not required by it. As far as is known it has not been adopted by any of the States. It has been evolved by judicial decisions and was definitively formulated by the Supreme Court in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. It provides that a confession or an admission

obtained during a period of unnecessary delay between arrest and appearance of the defendant before a committing magistrate, is not admissible in evidence at the trial. The rule does not concern itself with the question whether the confession is voluntary. Its purpose is solely to serve as a sanction or a means of enforcement of Rule 5(a) of the Federal Rules of Criminal Procedure, which requires an officer making an arrest to take his prisoner without unnecessary delay before a committing magistrate. The rule is of a purely practical nature and is not based on any principle of morals or abstract justice. It is somewhat anomalous because rules of evidence generally deal with materiality, relevancy or competency of evidence, while the Mallory doctrine is invoked merely as a means of enforcing another rule of practice. The impact of this new rule is particularly far-reaching in the District of Columbia, inasmuch as the District, being a Federal area, has no tribunal corresponding to State courts of general jurisdiction, and not only Federal offenses but also all felonies which elsewhere would be cognizable in State courts, in the District of Columbia are tried in the Federal court.[2]

■ While the Mallory doctrine is clear and definite, the opinion of the Supreme Court leaves one essential aspect without any definition. The meaning of the vital term "unnecessary delay" is left open, presumably for delineation by future decisions. The opinion makes it clear, however, that the term is flexible and that the extent of a permissible delay depends on circumstances. Thus, it contains the following comment (354 U.S. p. 455, 77 S.Ct. p. 1359, 1 L.Ed.2d 1479):

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between

---

2. In the District of Columbia there is a local Municipal Court, recently renamed Court of General Sessions, which has criminal jurisdiction over misdemeanors only.

arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession."

One phase of the question was crystallized by the Supreme Court in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, which ruled that a confession made promptly upon arrival at a police station or other place of detention, is admissible in evidence, since at that moment there is no violation of Rule 5(a). The case further held that the mere fact that subsequently an unnecessary delay may occur before the defendant is brought before a magistrate, does not retroactively vitiate the confession and render it inadmissible. In other words the test is whether a period of unnecessary delay has commenced prior to the making of the confession. The fact that it may have taken place later is immaterial. While the Mitchell case antedated the Mallory decision, the former was not overruled. The fact that the same member of the Supreme Court wrote the opinions in both cases, is significant in this connection.

The Supreme Court has not had occasion to speak on the meaning of the term "unnecessary delay" in Rule 5(a) subsequently to the Mallory case and, therefore, the topic remains open insofar as that Court is concerned. A scrutiny of the cases decided on this point by various Courts of Appeals indicates that the Circuits are in disagreement as among themselves. The difficulty is accentuated in the District of Columbia Circuit, because in the District of Columbia there are two conflicting and irreconcilable lines of decisions on this question. There thus appear to be no decisions in regard to it that are binding or controlling on this Court. As a consequence the law on this point is unsettled and in a state of flux.

Before proceeding to a detailed consideration of the cases, it seems desirable to endeavor to ascertain the intention of the draftsmen of Rule 5(a). It may be deduced from the Notes of the Advisory Committee on the Rules of Criminal Procedure, which accompanied the proposed Rules. While these Notes are not authoritative, they are somewhat analogous to a Congressional Committee Report in determining the intention of the framers of the Rules. The pertinent note on this point is as follows:

"What constitutes 'unnecessary delay', i. e., reasonable time within which the prisoner should be brought before a committing magistrate, must be determined in the light of all the facts and circumstances of the case. The following authorities discuss the question what constitutes reasonable time for this purpose in various situations". (cases cited)

Among the cases cited in the Notes are the following. In Janus v. United States (9th C.) 38 F.2d 431, it was held that an interval from 11:30 a. m. on the day of arrest until the following evening was not an unduly long preliminary detention. In Carroll v. Parry, 48 App.D.C. 453, a detention from Saturday afternoon until the following Monday morning, the Police Court not having been in session in the interval, was held not to constitute undue delay. In Commonwealth v. DiStasio, 294 Mass. 273, 1 N.E.2d 189, the Court reached the conclusion that holding a prisoner in custody from 1:00 p. m. on the day of arrest until the following morning, was not an unnecessary delay, as the session of the Criminal Court closed shortly after the defendant's arrest. In Peloquin v. Hibner, 231 Wis. 77, 285 N.W. 380, the defendant was arrested about 6:00 p. m. on Sunday, May 30, and was not brought to Court until 3:00 p. m. the following Tuesday, the intervening Monday being a holiday. The Court ruled that this interval did not constitute an unreasonable delay.

An analysis and comparison of decisions in the various Circuits dealing with the Mallory rule may cast an illuminating light on differences in its interpretation and application. The attitude of the Second Circuit toward the meaning of

"unnecessary delay" has been broad and flexible. In United States v. Ladson, 294 F.2d 535, the defendant was arrested on narcotics charges at about 7:00 p. m., and was taken to the office of the Bureau of Narcotics, where he made incriminating admissions that evening. He was then lodged in the Federal House of Detention for the night. On the following morning he was conducted to the office of an Assistant United States Attorney, who questioned him for about an hour, beginning at 11:00 a. m. The interrogation resulted in a written confession. At about noon, he was taken before a United States Commissioner. Both the oral admissions and the written confession were introduced in evidence at the trial. The admissibility of the former was not challenged. It was contended on appeal, however, that the written confession should have been excluded. The Court held that it was properly admitted, and wrote as follows on this point (Pp. 537–538):

> "We find sufficient justification on this record for a delay in arraignment of one hour to permit Ladson to be questioned by the Assistant United States Attorney. The admissions Ladson made to the narcotics agents the evening before had not been put into written form. *A delay of an hour or more for the purpose of reducing oral admissions to writing clearly does not violate Rule 5(a).* (cases cited.) The brief questioning by the Assistant was similarly a proper means of confirming Ladson's confession and putting it into a more usable form. [Emphasis supplied.]

> "It is well established that not all confessions made between arrest and the commissioner's hearing are inadmissible. (cases cited.) And, within reasonable limits, a chain of questioning need not be interrupted the very instant that it becomes appropriate and feasible to take the suspect before a commissioner. (cases cited.) This is so especially where, as in this case, the suspect is willing to talk."

In United States v. Vita, 294 F.2d 524, the defendant, who was charged with bank robbery, was accosted by several Federal Bureau of Investigation Agents, shortly after 10:00 a. m., as he was leaving a hotel and asked to accompany them to their headquarters to answer some questions. He was told that he was not under arrest and was free to leave at any time. During the day he was questioned intermittently and put in a "line-up". At 6:52 p. m. he was formally placed under arrest. At that time an oral confession that he had previously made was typewritten and signed. He was brought before a Commissioner on the following morning. The Court held that there had been no unnecessary delay and that the written confession was admissible in evidence. Some of the observations contained in the opinion of the Court are pertinent and persuasive. The Court stated, after expressly recognizing not only the desirability but the necessity of police interrogation of suspects and arrested persons (p. 532):

> "After the admissions, Vita was formally arrested, and about an hour was spent in reducing his admissions to writing; such delay is not 'unnecessary,' (case cited.)".

The Court explicitly indicated that it is not incumbent upon district courts to provide commissioners who would be continuously on duty to hold hearings. In footnote 1, page 529, the Court stated:

> "It is not incumbent upon the district court to place a commissioner on duty around the clock."

There are a number of significant decisions on this topic in the Eighth and Ninth Circuits. Taking up first the Eighth Circuit opinions, in Holt v. United States, 280 F.2d 273, the defendant was arrested on narcotics charges at 1:30 p. m. on Sunday afternoon, and placed in a cell. Between 4:00 and 5:00 p. m., he was interviewed for thirty to forty-five minutes, and made incriminating admissions. He was brought before a commissioner on the following Tuesday. The Court held that his confession was admis-

sible, as there had been no unnecessary delay between 1:30 p. m. and 5:00 p. m. on Sunday afternoon when the interrogation was completed.

In Feguer v. United States, 302 F.2d 214, 250–251, the defendant was arrested at about 2:00 p. m. He made some admissions to the arresting officer, who spent some time in trying to verify them. This process was completed at about 5:00 p. m. At that time no magistrate was available and the defendant did not have a hearing until 10:45 on the following morning. The Court held that the statements made by the defendant prior to 5:00 o'clock on the afternoon of the arrest were admissible in evidence on the ground that the detention up to that time did not constitute unnecessary delay.

In Evans v. United States, 325 F.2d 596, 603, the defendant was arrested by a local Sheriff on a Federal warrant at 10:30 a. m. He immediately made incriminating statements and then at the Sheriff's suggestion, he participated in a search for the proceeds of the crime. Agents of the Federal Bureau of Investigation took over the custody at 1:30 p. m. The defendant was brought before a commissioner after 5:30 p. m. The Court held that not only the statement made by the defendant to the Sheriff shortly after his arrest but also evidence of his participation in the subsequent search were admissible.

Taking up some of the decisions in the Ninth Circuit, in Williams v. United States, 273 F.2d 781, the defendant was arrested at 3:00 p. m. He was kept on the premises while a search was being conducted pursuant to a search warrant. Over two hours were consumed in this manner. At 6:00 p. m., the defendant arrived at the office of the Bureau of Narcotics. He was questioned and eventually made a written confession. He was not taken before a Commissioner until the following morning. The Court concluded that his confession was admissible, as keeping the defendant on the premises during the search did not constitute unnecessary delay, and further that Rule 5(a) does not require "round-the-clock"

availability of a committing magistrate. The following observations of the Court are pertinent (pp. 797, 798):

> "The law appears to be clear that the arresting officers do not have to make a bee line to the Commissioner's office.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> "[W]e are unable to say as a matter of law, that Rule 5(a) requires round-the-clock availability of a commissioner.

In Ginoza v. United States, 279 F.2d 616, the defendant was arrested on a narcotics charge between 3:15 and 3:30 p. m., and taken to the office of the Bureau of Narcotics, where he was questioned and made some admissions at about 4:-15 p. m. By this time the Commissioner had departed for home. The questioning then continued resulting in additional damaging statements. On the following morning the defendant was brought before the Commissioner. The Court in a decision *en banc*, by a vote of 4 to 3, held that there had been unnecessary delay and that the admissions should have been excluded at the trial.

A contrary result was reached later, however, in Muldrow v. United States, 281 F.2d 903. In that case, the defendant was arrested by the local police on a Friday night on a charge of stealing mail. At 9:30 on Monday morning the Federal authorities were notified and at 2:00 p. m. took custody of the defendant. He was brought to a Federal office and questioned for about a half hour. He made a written confession, and then was taken before a magistrate. The Court sustained the ruling of the trial court admitting the confession in evidence.

There appear to be no reported cases of significance on this point in any of the other Circuits. We now reach the decisions of the District of Columbia Circuit. There are a considerable number of them partly in view of the fact that ordinary felonies generally tried in State courts are cognizable in the District of Columbia in the Federal court and, therefore, the volume of criminal business of the Unit-

ed States District Court for the District of Columbia is proportionately much greater than that of other Federal courts. As previously stated, there is a deep cleavage between various cases decided by the Court of Appeals for the District of Columbia Circuit, resulting in two distinct conflicting and irreconcilable lines of authorities. Instead of summarizing them in chronological order, it seems helpful to recapitulate the decisions in each group separately. The cases in which confessions were held inadmissible will be taken up first.

In Watson v. United States, 101 U.S. App.D.C. 350, 249 F.2d 106, the defendant was arrested at 6:40 p. m., and was questioned intermittently. Oral admissions were made by him at about 3:15 a. m. In the morning prior to 9:00 o'clock he repeated his admissions and then was taken to the scene of the crime where, to use police parlance, he 're-enacted the crime", that is demonstrated step-by-step what he had done. Several hours later he was taken before a magistrate. The Court held that evidence of his admissions and of the re-enactment of the crime, were inadmissible.

In Trilling v. United States, 104 U.S. App.D.C. 159, 260 F.2d 677, the defendant was arrested at 5:30 a. m. At 8:45 a. m. he admitted his guilt of one of the crimes of which he was suspected. Beginning at about 10:00 a. m. he was again questioned and made further admissions. They were reduced to writing and at 2:30 p. m., he signed a written confession. He was brought before a magistrate between 3:00 and 4:00 p. m. The Court heard the case *en banc* and held that the first damaging statements made by the defendant were admissible in evidence, but that the subsequent admissions and the written confession should have been excluded. Two judges expressed the view that all of the damaging statements should have been excluded, while three judges dissented from the ruling excluding the later admissions and confession.

In Naples v. United States, 113 U.S. App.D.C. 281, 307 F.2d 618, 620–621, the defendant was arrested about 1:00 p. m., taken to a police station, and made oral admissions within ten minutes after his arrival. He then consented to visit the scene of the crime, where he narrated in detail what he had done. He was brought before a magistrate at about 4:30 p. m. The Court held that the early oral admission was properly introduced in evidence, but that the testimony regarding the re-enactment of the crime should have been excluded, on the theory that a period of unnecessary delay had then commenced.[3]

In Jones v. United States, 113 U.S.App. D.C. 256, 307 F.2d 397, the defendant was arrested on a Sunday at 4:25 a. m. After being questioned for about an hour, she was taken to the scene of the crime, where with her help the police found the weapon used in its commission. She was then returned to Police Headquarters and the interrogation was resumed. At about 8:00 a. m. she signed a full confession. She was brought before a magistrate on Monday morning at about 9:00 a. m. The Court held that the confession was inadmissible on the ground that about three hours elapsed between the arrest and the time when it was signed.

In Tatum v. United States, 114 U.S. App.D.C. 188, 313 F.2d 579, the defendant was arrested at 8:00 p. m., and arrived at the police station about 8:50 p. m. When first questioned he denied knowledge of the crime. At 11:00 p. m., he was confronted with a co-defendant, who had confessed. He was then again questioned intermittently and at about 12:15 a. m. he confessed. A written confession was prepared and signed at 3:00 a. m. The defendant was brought before the Commissioner at 10:00 a. m. It was held that the confession should have been excluded because a period of unnecessary delay commenced before it was obtained. The Court in the course of its opinion makes the comment that "a magistrate is reg-

---

3. The opposite result on somewhat similar facts was reached in the Eighth Circuit in Evans v. United States, 325 F.2d 596, 603, supra.

ularly available at any hour". The same comment is reiterated in Coleman v. United States, 114 U.S.App.D.C. 185, 313 F.2d 576, where the defendant was arrested at 6:45 p. m., and made a confession at 8:50 p. m., which was reduced to writing between 9:10 and 10:50 p. m. The defendant was brought before a magistrate at 10:00 a. m. on the following day. The confession was held inadmissible on the ground that too long an interval had elapsed between the arrest and the signing of the confession. The observation that a commissioner is available at any time is repeated in another connection, in Mitchell v. United States, 114 U.S.App.D.C. 353, 316 F.2d 354.

The statement that in the District of Columbia a magistrate is regularly available at any hour requires an explanation, lest it be misconstrued or misunderstood. Manifestly, it is not intended to mean that there is a magistrate on duty at the courthouse twenty-four hours a day, every day in the year, because that is not the fact. What is meant is that since in the District of Columbia there are a number of committing magistrates,[4] it is possible to reach one of them by telephone, arouse him out of bed, request him to get dressed and come down to the courthouse to hold a hearing. As the Courthouse is located in the downtown area and many Washingtonians live in outlying residential sections, it may be necessary for the magistrate to drive down to the Courthouse, bearing in mind, of course, that as a judicial officer he must abide by speed limits and other traffic regulations. It may take as long as two hours from the time a telephone call is received by the magistrate until he reaches the Courthouse. In the instant case, it required about one and three-quarters hours.

The practice of holding a hearing outside of court hours is followed only in special cases, since it would be an intolerable imposition on magistrates to be called upon to do so in the dead of night in the case of every person arrested for a felony, for a number of such arrests are generally made nightly. Other decisions, about to be reviewed, hold that such a course is not required at all. Actually, one may well wonder whether a person charged with a felony should have a vested right to such immediate service. It would seem that a magistrate is as much entitled to an uninterrupted night's sleep as a Circuit or District judge. It may perhaps be argued that if any arrested person should as a matter of fairness receive such an accommodation, it should be a person charged with a misdemeanor or a petty offense, who is locked up because he does not have enough money on his person to deposit as collateral, especially as in case of conviction, the penalty imposed may be only a fine.[5]

Turning now to the opposite line of decisions of the Court of Appeals for the District of Columbia Circuit, one of the earliest cases decided on this question after the Mallory opinion was rendered, was Metoyer v. United States, 102 U.S. App.D.C. 62, 250 F.2d 30. There the defendant was arrested at noon in nearby Maryland, in connection with a shooting that had taken place in Washington, on the preceding day. At 1:00 p. m. Washington police officers arrived and asked the defendant whether he had fired the fatal shot. His reply was in the affirmative and was followed by a narration of the circumstances. He was then confronted and identified by eye-witnesses. Within twenty-five minutes after his oral admission, the preparation of a written statement was commenced. It was,

4. In the District of Columbia there is one United States Commissioner and a number of judges of the Municipal Court, which during the past year has been renamed the Court of General Sessions, all of whom perform the duties of committing magistrates.

5. It may be interesting to note that in New York city there is a night court in the State Judicial System, which holds sessions from about 7:30 p. m. until about midnight. It deals only with cases of misdemeanors and petty offenses, but not felonies. This information was obtained from Leland Tolman, Esq., Departmental Director of Administration of the Judicial Conference of the State of New York.

completed and signed by the defendant at about 2:15 p. m. He was then brought before a local Maryland judge, waived extradition and was removed to the District of Columbia. He was taken before a magistrate in Washington at 5:30 p. m. The Court held that the written statement was properly admitted in evidence at his trial on a charge of murder. The Court stated in its opinion that the law has always favored and encouraged the writing of freely expressed declarations and added the following observation (102 U.S.App.D.C. p. 65, 250 F.2d p. 33):

> "If police are compelled to arraign all potential suspects before questioning any of them we shall have used the artificial niceties and superficial technicalities concerning our liberties to reduce genuine and important rights to absurdity—and dangerous absurdity at that. Every citizen has a right to insist that the police make some pertinent and definitive inquiry *before* he may be arraigned on a criminal charge, which even if it is later abandoned inflicts on him a serious stigma." (Emphasis original.)

Curiously enough counsel for the defendant did not urge on appeal that the confession was a product of prolonged detention, but on the contrary complained of what he called the "undue speed" with which the Washington police acted, claiming that this expedition tended to frighten the defendant.

In Perry v. United States, 102 U.S.App. D.C. 315, 253 F.2d 337, the defendant was arrested at his home at 10:30 p. m. on a charge of rape. He made incriminating statements to the arresting officer before he was taken away. The Court held that such statements were admissible on the basis of the ruling in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, supra.

Porter v. United States, 103 U.S.App. D.C. 385, 258 F.2d 685, is particularly important because Mr. Justice Reed, a retired Associate Justice of the Supreme Court, was a member of the panel that rendered the decision and wrote the prevailing opinion. In that case the defendant was arrested on assault charges on Tuesday, at 10:30 p. m., and made a statement which was completed by 11:15 p. m. On the following morning prior to 9:00 a. m., he verbally repeated his statement, and then was taken to court. Before the hearing began, however, information was received that the defendant's victim had died and the defendant was then brought back to Police Headquarters. At 12:45 p. m., he began making a written statement, which was completed an hour later. At 3:30 p. m. he was taken before a magistrate. All of his statements, oral and written, were held admissible. The Court also reached the conclusion that there is no obligation to hold commitment hearings at night. In discussing the procedure in States which also use the phrase "unnecessary delay", Mr. Justice Reed stated (103 U.S.App.D.C. p. 389, 258 F.2d p. 689):

> "Both New York and Illinois recognize that the rule for production 'without unnecessary delay' is during the ordinary professional hours of commissioners and judges."

He also made the following observation (103 U.S.App.D.C. p. 392, 258 F.2d p. 692):

> "Surely a man arrested Tuesday night at eleven o'clock for assault need not be taken before a magistrate until the next morning."

This case has been cited with approval and followed as authoritative in other Circuits, Williams v. United States, (9th C.) 273 F.2d 781, 798; United States v. Vita, (2d C.) 294 F.2d 524, 529, footnote No. 1.

In Heideman v. United States, 104 U. S.App.D.C. 128, 259 F.2d 943, affirming (D.C.) 21 F.R.D. 335, the defendant, a sailor in the United States Navy, was turned over by the Navy to the local police at 3:00 p. m. He was questioned briefly but denied his complicity in the robbery with which he was charged. After the usual routine procedure of making the necessary records, finger-

prints and the like, was completed, the defendant between 3:30 and 3:45 p. m. made a confession. A half hour later he was brought before the commissioner. The confession was held admissible. The opinion contains the following enlightening comments on this subject (104 U.S. App.D.C. pp. 130–131, 259 F.2d pp. 945–946):

"At the outset, the police, assuming they have probable cause for arrest, are entitled to ask the arrested suspect what he knows about a crime. If he denies knowledge, they are entitled to state to him what evidence they have and ask whether he cares to comment upon it. A strong circumstantial case which would satisfy the U. S. Commissioner, prima facie, might well be explained away by a suspect who knew what information the police relied on—hence leading to no charge being made. If the suspect continues to deny knowledge, the police are entitled to conclude the interview by saying, in effect, 'Do you have anything further to tell us, or do you just want to let it stand the way it is?' which was what Detective Conley asked appellant. Such questions as these the police may ask—indeed *should* ask; it is only when the questioning crosses into what can be termed 'grilling,' or is continued beyond the brief period allowed, that the resulting confession may be held inadmissible." (Emphasis original.)

Another case of importance, because Mr. Justice Burton, a retired Associate Justice of the Supreme Court, was a member of the panel, is Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915. There the defendant was arrested at 4:30 a. m. and immediately made an oral confession to the arresting officer. He was then driven to the scenes of various crimes and at about 6:30 a. m. arrived at a police station. At 9:10 a. m. the officer began to type the oral confession, which the defendant had previously made, to which the latter added some further details. At 1:45 p. m. the defendant was brought before a magistrate. It was held that no unnecessary delay had taken place and that the written confession was properly admitted in evidence at the trial. In this case also it was definitively held that there is no obligation to hold preliminary hearings at night. On this point the Court stated (106 U.S.App.D.C. p. 166, 270 F.2d p. 918):

"* * * there is no requirement that a committing magistrate be available at all hours."

In Goldsmith v. United States, 107 U.S. App.D.C. 305, 277 F.2d 335, the defendant was arrested at 12:30 p. m. and arrived at a police station a half hour later. He was questioned and then confronted with witnesses. He made some oral admissions at 3:35 p. m., which were thereupon reduced to writing. At 5:30 p. m. he was brought before a magistrate. The Court of Appeals held that both the oral and written confessions were admissible. The Court made the following significant observation (107 U.S.App.D.C. p. 313, 277 F.2d p. 343):

"No court has yet held that a reasonable period of time elapsing between the occurrence of an oral confession and the time reasonably necessary to reduce it to writing for it to be signed is 'unnecessary delay' and we are not prepared to do so now."

The Court also emphasized the fact that the probable cause which is adequate to justify an arrest may not be sufficient to warrant a committing magistrate to bind the defendant over. More evidence is frequently required at that stage, just as still more evidence may be needed to justify an indictment.

In Day v. United States, 108 U.S.App. D.C. 200, 281 F.2d 33, a confession made by the defendant while he was being driven from the place of arrest to Police Headquarters, was held admissible on the authority of the Mitchell case, supra, and the fact that subsequently a delay occurred prior to bringing him before a magistrate was deemed immaterial.

In Turberville v. United States, 112 U.S.App.D.C. 400, 303 F.2d 411, the defendant was arrested at 11:20 p. m. and arrived at Police Headquarters at about midnight. He then made an oral statement, which was reduced to writing. The preparation of the written statement was commenced at 12:30 a. m. and completed at 1:25 a. m. The defendant was brought before a magistrate at 10:00 a. m. It was held that there was no unnecessary delay and that both the oral and written statements were admissible. In disposing of the matter, the Court stated (112 U.S. App.D.C. p. 406, 303 F.2d p. 417):

> "We think that 'unnecessary delay' within the meaning of Rule 5(a) and the Mallory case has not occurred when a defendant is arrested, brought to police headquarters around midnight, begins to make a statement within thirty minutes thereafter, and is then taken before a magistrate at 10 a. m. the same morning."

In Hughes v. United States, 113 U.S. App.D.C. 127, 306 F.2d 287, the defendant was arrested about 2:25 a. m. at his home. At about 3:25 a. m., which was within thirty minutes after reaching the police station the defendant made an oral confession which was typewritten at 4:05 a. m. and signed. Between 5:00 and 5:-30 a. m. the victim of the crime was brought to the station to confront the defendant. At 10:00 a. m. the latter was taken before a magistrate. It was held that both the oral and the written confessions were properly admitted at the trial.

In Jackson v. United States, 114 U.S. App.D.C. 181, 313 F.2d 573, the defendant was arrested at 9:45 a. m. At 10:30 a. m. he admitted his participation in the crime of which he was accused. At 10:50 a. m. a written statement was commenced and was completed at 11:55 a. m. He was taken before a commissioner between 2:30 and 3:20 p. m. The Court held that the written statement was obtained without unnecessary delay and, therefore, was admissible. The Court observed that the critical period is that between arrest and confession and that detention after a confession does not affect its admissibility.

In Muschette v. United States, 116 U.S. App.D.C. 239, 322 F.2d 989, the defendant was arrested at his home at about 2:20 p. m. and was taken to Police Headquarters where he arrived 15 minutes later. Within ten minutes he made an oral confession. It was reduced to writing and signed about 3:45 p. m. At about four o'clock, the defendant was taken to the commissioner. The Court held that the confession was admissible and indicated that a reduction of a confession to writing should be encouraged, stating (322 F.2d p. 991):

> "We comment further that the typing and signing of a confession voluntarily given is not always and exclusively a detriment to the accused because, once written, his statement cannot be changed by his accusers. Written versions of statements by prospective witnesses are well-nigh universal practice. What the witness—or an accused—said is not thereafter the subject of convenient recollection. So the typing of a voluntary confession is neither unnecessary or unreasonable. We think that in the present case it was proper procedure."

The latest decision of the Court of Appeals for the District of Columbia Circuit on this point was rendered on February 6, 1964, Bailey v. United States, 328 F.2d 542. There the defendant was arrested at about 12:20 a. m. on Saturday, and immediately made an admission to the officers. He was then taken to a police station where he made another oral admission at about 12:50 a. m. He was then taken to Police Headquarters where at 1:30 a. m. the typing of a statement was begun, and was completed and signed at about 2:00 a. m. The defendant was taken before a magistrate on the following Monday morning. The Court held that the confession was properly admitted. It was observed that there was a threshold oral confession while the typewritten statement was prepared and signed immediately thereafter.

■ Thus, as has been stated, there are two conflicting and irreconcilable lines of decisions in the District of Columbia Circuit. Moreover, the two do not follow each other in chronological order, but cases in both groups are interspersed. Manifestly, this is due to the varying composition of panels of judges who sat in the various cases, since in this Circuit there are nine circuit judges. The conclusion is inescapable, therefore, that the law in this Circuit at any rate, is unsettled. The cases agree only on one point, namely, that a so-called threshold confession, that is one made at the time of arrest, or immediately upon arrival at headquarters, is admissible, since no delay has yet begun. A clarifying opinion of the Supreme Court is much to be desired unless, indeed, the matter should be settled by legislation.

■ In view of the fact that the question is open in this Circuit, it becomes incumbent upon district judges to find and determine the law. This must be done by an application of the principles of the common law as they may be interpreted "in the light of reason and experience,"[6] with such aid as can be deduced from the authorities. This is not unusual or novel for trial judges, since in spite of the plethora of decisions of appellate courts, points of law still at times arise that have not been settled by binding or controlling authorities. In fact the common law and equity jurisprudence were developed over the centuries largely by opinions of trial judges.

■ Law enforcement agencies are attached to the executive branch of the Government. Consequently under our basic and fundamental tripartite division of the departments of the Government, the judiciary has no power of supervision or control over them.[7] This authority is vested in their superior officers. On the other hand, the Courts may adopt rules of procedure and rules of evidence, which may result in limitations on the activities of prosecuting attorneys and law enforcement agencies, requiring them to modify or change some of their practices, possibly eliminating some of them and curtailing their activities. The Mallory rule must be viewed from this standpoint.

■ Taking up specifically the interpretation and construction of the words "unnecessary delay" as contained in Rule 5(a) of the Federal Rules of Criminal Procedure and as applied in the Mallory case, at the outset it must be said that some delay is permissible, because only unnecessary delay is proscribed. Obviously the arresting officers must have time for routine procedure, such as booking, fingerprinting and photographing the prisoner, and preparing the necessary records. Since probable cause for making an arrest is not always sufficient to justify a committing magistrate in binding over the defendant, as more evidence is required in the latter instance than in the former, a reasonable time may be consumed in some additional investigation. For example, if the presence of the victim or some other identifying witness can be promptly secured in order to confront the defendant, a delay is permissible for this purpose. It is proper for an investigating officer to interrogate the defendant. Neces-

---

6. Rule 26 of the Federal Rules of Criminal Procedure.

7. A masterly discussion of the American contribution to political institutions in creating three co-ordinate branches of Government is found in the celebrated dissenting opinion of Chief Justice Stone (then Associate Justice) United States v. Butler, 297 U.S. 1, 78, 56 S.Ct. 312, 324, 80 L.Ed. 477, in the course of which he made the remark: "Courts are not the only agency of government that must be assumed to have capacity to govern."

Chief Justice Taney in Decatur v. Paulding, 14 Pet. 497, 515, 10 L.Ed. 559, made the following observation:

"The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied, that such a power was never intended to be given them."

See also, Trimble v. Johnston (D.C.), 173 F.Supp. 651.

sarily this must be done fairly and not oppressively and must not be prolonged unreasonably to a point at which the suspect becomes physically or mentally exhausted. There, however, we are confronted with the rule of voluntariness. The prisoner has a right to be interviewed promptly after he is brought to headquarters in order that he may have an opportunity to explain or give any exculpatory information that may possibly lead to his prompt release without being taken to court and formally charged. In so doing officers are not performing a quasi-judicial function, but are merely determining whether they have sufficient evidence to proceed with the case. It would be arbitrary and unjust to fail to accord a prisoner this opportunity or to decline to listen to what he desires to say. If he gives exculpatory information, such for instance as an alibi, a reasonable time may be taken for the purpose of checking and verifying it. If the prisoner is willing to make a written statement, a reasonable time may be consumed in reducing it to writing. Written statements should be encouraged in order that there may be no dispute thereafter as to what the defendant said. This course is proper for the protection of both the public and the defendant.

 There is no legal obligation on the part of a committing magistrate to hold a hearing out of office hours, as for instance during the night or on Sunday and, if this is done, it is entirely at his own discretion. Consequently if the procedure described above runs into a night or a week-end, no unnecessary delay commences until the following morning, or the morning of the next business day, as the case may be. Any statement made before an unnecessary delay starts should be admissible in evidence.

 Applying these principles to the case at bar, we are confronted with an arrest taking place at 10:15 p. m. and a written confession signed at 12:20 a. m. The defendant had a preliminary appearance before a magistrate at 2:05 a. m. This was an accommodation accorded to him in the discretion of the magistrate. No unnecessary delay occurred between 10:15 p. m. and 12:20 a. m., when the confession was signed, and the confession was therefore properly admitted.

The defendant relies on Seals v. United States (D.C.Cir.), 325 F.2d 1006. In that case the defendant was approached on the street by Agents of the Federal Bureau of Investigation at about 3:05 p. m. He was informed that he was not under arrest. He was questioned concerning a bank robbery. The Agents and Seals went to Seals home and with his consent the apartment was searched. About 4:15 p. m. he was asked to come to the Federal Bureau Field Office "to talk further", which he consented to do. He was informed that he was not under arrest and was advised of his rights. He was further questioned and at 7:10 p. m. he admitted his participation in the crime. At that point he was notified that he was under arrest and within an hour thereafter he was brought before a commissioner. The Court held that the arrest took place not later than 4:30 p. m., when Seals was brought to the Federal Bureau of Investigation office, rather than at 7:10 p. m., as the Government contended.

This case is distinguishable on its facts, in that Seals testified that he believed that he was not free to leave the Bureau office. There is no such testimony in the instant case. In fact there is no contradiction of the testimony of Sergeant Gray that the defendant was informed that he was not under arrest and was free to leave at any time, and that he acted on that assumption.[8] He was permitted to roam around the building.

8. At the time of the trial of the instant case, the Seals case was pending in the Supreme Court on a petition on a writ of certiorari, and had not become final. Subsequently, certiorari was denied, 84 S.Ct. 1123. It is interesting to observe that in United States v. Vita, 294 F.2d 524, where a contrary result was reached by the Second Circuit on a somewhat similar state of facts, certiorari was also denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788.

 There is another important differentiation between the Seals case and the case at bar. Even if it should be deemed that the defendant was in custody from the time when he arrived at Police Headquarters on Saturday, January 26, 1963, at 2:30 p. m., this Court would still conclude that no unnecessary delay occurred before he was accorded a hearing by a committing magistrate. The Court will take judicial notice of the fact that court sessions are not held on Saturday afternoons. Within the principles above discussed, the defendant was not entitled as of right to be taken before a magistrate that afternoon or evening. That he was granted such an opportunity at about two o'clock in the morning was entirely within the magistrate's discretion. Consequently, the confession should not be excluded even on the theory, which the Court does not accept, that the defendant became a prisoner at 2:30 p. m. instead of 10:15 p. m.

 In dealing with rules of procedure and rules of evidence, one must not become so immersed in details and minutiae as to lose sight of the ultimate objective. One must not permit the trees to obstruct a view of the forest. The function of the criminal law is to protect the public and its individual members against depredations on the part of persons who fail to observe the rights of others. The purpose of the trial of a criminal case is to determine the guilt or innocence of the accused: to convict him if he is guilty and his guilt has been established by proof beyond a reasonable doubt; and to acquit him if he is innocent or if his guilt has not been proved beyond a reasonable doubt. Other issues should not be emphasized beyond their proportion or distorted out of their proper perspective. It is to be deplored that at many trials too much attention has to be devoted to tangential issues that have no bearing on the guilt or innocence of the defendant. The conviction of an innocent person would be a tragedy. The acquittal of one whose guilt has been established by overwhelming evidence is likewise a miscarriage of justice.

 Rules of Criminal Procedure "are intended to provide for the just determination of every criminal proceeding".[9] They are not an end in themselves. They are merely the means and the instruments by which the purpose of the administration of justice is achieved. The safeguards that surround a defendant are not intended to constitute obstacles and hurdles against conviction of the guilty, but are designed to prevent the possible conviction of an innocent person, or a person whose guilt has not been satisfactorily established beyond a reasonable doubt.[10] They may be likened to a screen with meshes so constructed as to sift the guilty from the innocent.

The sardonic epigram uttered by Judge Wilbur K. Miller of this Circuit, in his dissenting opinion in Killough v. United States, 114 U.S.App.D.C. 305, 329, 315 F.2d 241, 265, " * * * [i]n our concern for criminals, we should not forget that nice people have some rights too", succinctly epitomizes what seems to be the appropriate attitude toward the enforcement of the criminal law.

Mr. Justice Jackson in Stein v. New York, 346 U.S. 156, 196–197, 73 S.Ct. 1077, 1099, 97 L.Ed. 1522 said:

"We are not willing to discredit constitutional doctrines for protection

9. Rule 2 of the Federal Rules of Criminal Procedure.

10. In this connection, it is interesting to recall the remarks of Judge Learned Hand in United States v. Garsson (D.C.), 291 F. 646, 649:

"Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least fair doubt in the minds of any one of the twelve. * * * Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

of the innocent by making of them mere technical loopholes for the escape of the guilty."

*A fortiori*, these remarks, although directed primarily to principles of Constitutional law, are applicable to the law of evidence and to rules of procedure.

The underlying philosophy of criminal procedure was expressed by Mr. Justice Cardozo in Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674, in his inimitable manner:

" * * * justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

The motion for a new trial is denied.