Luther P. MITCHELL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17096.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 17, 1962.

Decided Feb. 7, 1963.

---

Mr. Rex K. Nelson, Washington, D. C., (appointed by the District Court) for appellant.

Mr. William C. Weitzel, Jr., Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee. Mr. Nathan J. Paulson, Asst. U. S. Atty., at the time the record was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, and EDGERTON and WASHINGTON, Circuit Judges.

BAZELON, Chief Judge.

After a trial by jury, appellant was convicted of robbery (D.C.Code § 22–2901) and sentenced to a term of imprisonment of five to fifteen years. His first claim on appeal is that the trial court erred in admitting certain inculpatory statements allegedly made during a period of illegal detention. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

Appellant was arrested on Sunday, August 13, 1961, at 2:45 a. m.[1] He was questioned at police headquarters about a crime not here in issue until about 8:00 a. m., during which time he made repeated requests to contact a named attorney. The police apparently permitted him to telephone the attorney's office, but there was no answer. At 8:00 a. m., he was taken before Judge Howard of the Municipal Court for preliminary hearing.

What transpired there is in dispute. At trial, Judge Howard testified[2] that "I advised him that he could stand mute; it wasn't necessary for him to testify; it wasn't necessary for him to say anything, and I also advised him that if he did make any statement it might be used against him." Detective Caton testified that Judge Howard advised appellant "that he was not required to make a statement, and if he did make a statement it would be used against him." And Detective Bader testified that appellant was advised that "any statement he made would be held against him; he didn't have to make any statement."

The defendant testified that he received no such warning. The Assistant United States Attorney, Mr. Duffy, who was at the proceeding before Judge Howard, testified: " * * * I will have to say this definitely, it is my best recollection that the defendant was not informed that he was not required to make a statement, and it is again my best recollection that the defendant was not informed any statement he may make would be used * * * against him." The usual nota-

---

1. The police had probable cause for believing that he participated in another crime committed that night.

2. Judge Howard was produced as a Government witness at the request of the trial judge, who stated:
"The reason I think he ought to be accorded the opportunity [to testify] in this, for his own protection, as well as for the case. After all you have to consider all the possibilities. Suppose this matter is appealed, suppose it goes to the Court of Appeals, well of course I might say, well, in my opinion the recollection of the officers is

better than that of Mr. Duffy [the Assistant United States Attorney at the proceeding before Judge Howard], but I am not sure that I will, because Mr. Duffy is a lawyer, and he was an officer of the court."
The trial judge also volunteered to call Judge Howard "as a Court witness."
For some unexplained reason Judge Howard was permitted to testify in front of the jury even though his testimony was relevant only to a non-jury issue—violation of the Mallory rule—and despite the prejudicial effect such testimony would inevitably have upon the jury.

tion that the defendant was advised of his rights was not made in the "jacket." [3]

At the close of the preliminary hearing, the police asked Judge Howard to sign an order releasing appellant to the custody of the Deputy United States Marshal so that he could be taken to police headquarters for six hours for "continuing the investigation." [4] This request was granted. After two and a half hours of further questioning and a lineup at which appellant was identified as the perpetrator of the instant offense, the police "got a statement from him." This statement was admitted into evidence at appellant's trial over the repeated objections of counsel.

Counsel rested these objections on the ground that defendant had not been advised of his rights until Monday morning, and hence the statement was made during a period of unreasonable delay between arrest and effective preliminary hearing. Throughout the trial, the trial judge assumed that an effective hearing was *not* held until Monday. He explicitly based his refusal to suppress defendant's statement on the mistaken idea, which he repeatedly expressed, that since defendant was arrested on Sunday, there was no obligation to hold a hearing until Monday. He said, "Of course I would say that since August 13th was a Sunday there was no duty to give the defendant a preliminary hearing until Monday. Judges are just as much entitled to their Sunday as all the other human beings." "* * * The Mallory case rule does not apply because it has been held time and

time again that a person who is arrested Saturday night and Saturday afternoon need not be brought before a magistrate until Monday morning." "Personally I think it is cruel and unusual punishment. Personally I think that * * * absurd to give that kind of service to a defendant. It isn't done anywhere else but here. After all he could wait until office hours * * *." "No one is entitled to a hearing between 5:00 o'clock in the afternoon and 10:00 o'clock the following morning, and no one is entitled to a hearing between Saturday noon and 10:00 o'clock the following Monday morning." "* * * I will overrule the objection on the ground that it was not unreasonable delay and not within the meaning of the rule of the Mallory case to hold the prisoner from the early hours of Sunday morning until Monday morning without a hearing."

■ This is directly contrary to repeated decisions of this court. It is not true that Rule 5(a) is in effect only during business hours; we held long ago that "both by law and practice * * * application for hearing might have been made to * * * committing magistrates at any hour." Akowskey v. United States, 81 U.S.App.D.C. 353, 354, 158 F. 2d 649, 650 (1946). We recently said: "[N]ot only a magistrate, but an Assistant United States Attorney, are, and were * * * available to the police twenty-four hours a day." Jones v. United States, 113 U.S.App.D.C. 256, 307 F. 2d 397, 399 (1962). Compare Porter v. United States, 103 U.S.App.D.C. 385, 258

---

3. Another preliminary hearing was held before the same judge the following morning. The "jacket" indicates that appellant was then apprised of his rights. It is possible that certain witnesses confused these two proceedings. Note, for example, the following exchange:
"Q. Now Mr. Caton, if I were to tell you the information in this case shows that he was advised of his rights on the 14th rather than the 13th, would that in any way conflict with your recollection of what happened over there?
"A. Well, I don't know whether the judge stamped it [that defendant had been advised of his rights] on the 13th

or whether he stamped it on the 14th, or when he stamped it."

4. At trial the police officer was asked the following question: "And is it not the purpose of this particular order the reason they sent it over for continuing investigation was to permit members of the Metropolitan Police Department to ask this defendant about what he knew about this crime, or any other crime that you might suspect him * * *." The trial judge interjected: "That is obviously the purpose of the order. You don't have to prove the obvious."

F.2d 685 (1958), cert. denied, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257 (1959). Moreover, "[i]f because of some extraordinary circumstance no magistrate were available, it would not follow that questioning could continue." Coleman v. United States, 114 U.S.App.D.C. ——, 313 F.2d 576 (1962). Pending a hearing before a magistrate who informs the suspect of his rights, the police may not "carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt." Mallory v. United States, supra, 354 U.S. at 454, 77 S.Ct. at 1359. We must reject any suggestion that a suspect arrested at noon on Saturday may be questioned in secret by the police for 46 hours without a preliminary hearing.

It seems apparent that throughout the trial the court, in refusing to exclude the confession, relied on this erroneous view of the law. After the closing statements, however, the court called the lawyers to the bench and said: "I think in order that there be no ambiguity in the record, the Court should make certain findings of fact on matters on which the Court had to pass * * *. I find as a fact that Judge Howard, at the preliminary hearing on the morning of Sunday, August 13, warned the defendant of his rights,[5] or apprised him of his rights, including the right not to make any statement." [6]

In view of Judge Howard's action in turning appellant over to the police for six hours of questioning without counsel, we think that the trial judge's finding of fact does not dispose of appellant's claim. We need not decide whether in some circumstances a magistrate may properly deliver a suspect who has not consulted counsel to the police for interrogation.[7] We need only decide that this cannot be countenanced where, as here, the record raises substantial doubt that the suspect was informed by the magistrate that he need not answer any question asked by the police in any such interrogation, and that any answer or statement he gives may be used against him. In Goldsmith v. United States, 107 U.S.App.D.C. 305, 277 F.2d 335, cert. denied sub nom. Carter v. United States, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86 (1960), a divided court held that in some circumstances a magistrate could permit interrogation after a preliminary hearing, but the court stressed that counsel had "consulted with appellants for about 15 minutes advising appellants of their right[s]," and that "The Municipal Judge formally gave them the same warning."

And in Robinson v. United States, 113 U.S.App.D.C. 372, 308 F.2d 327 (1962), the court pointed out that the accused was "fully" advised of all his rights before being turned back to the police.

Here there is doubt concerning not only what the magistrate said at the Sunday hearing about the right to remain silent, but also whether he said anything about it. The Assistant United States Attorney testified, as a Government witness, that the magistrate did not; and the usual notation that such a statement was made is absent. And even the testimony that the magistrate said something about the right to remain silent is subject to the construction that he told the accused only that he need make no "statement" *at the preliminary hearing*. There was no testimony that the accused was ever judicially informed that he need not answer any question put to him by the *police* at the forthcoming six-hour interrogation. And

---

5. The trial judge thus disbelieved the Assistant United States Attorney, despite prior intimations to the contrary. See note 2 supra.

6. It is significant that the trial judge did not find as a fact that defendant had been cautioned that "any statement made by him may be used against him." This warning is required by Rule 5(b).

7. Although the magistrate set bail prior to turning the accused over to the police, the record does not show whether the accused could have avoided the inquisition by immediately posting bail. It is sufficient for present purposes to note that such a practice would raise serious problems of impermissible discrimination.

the trial judge made no finding that the accused was ever told that "any statement made by him could be used against him." [8]

■ Since the record provides no assurance that the accused was adequately informed of his rights, we hold that his confession was obtained in violation of Rule 5(a) and (b) and is therefore inadmissible.[9]

We turn now to appellant's claim that the trial judge erred in denying him a mental examination.

On the morning of trial, defense counsel made a written motion for a mental examination. It alleged that the defendant, that very morning, had "displayed to counsel a file containing copies of letters he has directed to the President of the United States, Eleanor Roosevelt and members of the United States Senate, which raise inquiry in counsel's mind with respect to the defendant's mental situation." It also alleged that counsel had just "learned that the defendant is epileptic and has been so for some period of time; that he apparently has been under daily sedation through prescriptive drugs while awaiting trial; that during a confinement some years ago in Richmond Virginia he was interviewed by a Psychiatrist who, so the defendant states, appeared under the impression that the defendant should have treatment; that the defendant has two trades, barbering and cooking, in either of which he normally could earn a good livelihood, but defendant cannot give logical explanation to counsel for repeated criminal activities."

Counsel explained, in justification of the alleged lateness of his motion, that until that morning "although [he] had some idea," he had "nothing substantial" with which to approach the court for a mental examination.

He then showed the court some of the letters the defendant had written. One said: "Mr. President, if you recall, your last letter to me specifically stated that if I can be of any help to you don't hesitate to call on me * * *. These words are very powerful. The wisest man on earth once said, life and death are in the power of the tongue. * * * Mr. Moses advises us in both of his books to square our actions with the Ten Commandments, and Jesus said it by the Sermon on the Mount. Mr. President * * * you, yourself, gave me your honorable words that should I be in need, just call on you."

The trial judge responded that "It is not a sign of insanity to quote the Bible. I quote the Bible sometimes myself." Counsel then reminded the judge that the defendant "is subject to seizures," to which the judge responded: "Lots of epileptics are sane you know." Counsel then said: "He has been given some type of medication at all times down at the jail," to which the judge responded: "Julius Caesar was an epileptic and I believe Napoleon was." Counsel said the defendant had in the past been "interviewed on several occasions by a psychiatrist, and his statement to me was that the psychiatrist told him that * * * 'you'd better come to see me for treatments.'" The court replied: "Well, he may be an epileptic, but that does not necessarily—some epileptics are sane, but some are not."

The trial judge then denied the motion, but it is not clear on what ground. He said: "In the first place, I think it comes much too late. I think it is an imposition on the Court * * *." He went on to say, "* * * If there was a real substantial showing and if there was a good reason why defense counsel was not in a position to know the facts previously, of course an exception would be made * * *." He concluded that "in addition to that, entirely aside from [the lateness of the motion], I do not think there is enough showing for a mental examination, even

8. Rule 5(b), Fed.R.Crim.P. See note 6 supra.

9. Since there is no indication that defendant's identification at the line-up resulted from any testimonial statements made by him during a period of illegal detention, the identification is admissible.

if it was made on the day after the indictment was returned."

The trial then began. At an early stage defendant was called to the stand to testify out of the hearing of the jury on the Mallory issue. He immediately interrupted the questioning and said: "Just before that we go any further with this case, I would like to say one thing, as we realize we ought to square our actions with the Ten Commandments and the Sermon on the Mount concerning the law, and I do not feel to be tried by this judge because of the fact I feel that he is prejudiced * * *. He is cracking and making jokes concerning—he is cracking and making jokes concerning the case * * *. Now in the law it is a very serious matter." The judge then ordered the marshal to remove him from the stand until he learned to "behave himself." He was subsequently permitted to return, and testified that he had recently written to Eleanor Roosevelt, "the first lady of the house * * *. Well she's in the house, the President's wife; I mean she is in the house." [10] The trial judge asked whether defendant was trying "to prove by his own testimony that he was insane?" Counsel explained that because of defendant's lack of funds with which to obtain psychiatric evaluation and testimony, he had no choice but to attempt to establish insanity by defendant's own testimony. The trial judge then told the *prosecuting* attorney that "If necessary, you may have the defendant examined in the psychiatric clinic this afternoon and let me have a report in the morning." He made no such offer to the defense, and the prosecutor apparently declined the offer.

Defendant then testified that he suffered from "epileptic seizures and a nervous condition," that he had the seizures for at least nine years and the nervous condition "since that [he] was born, and that [he is] presently receiving treatment from the doctor at the D. C. Jail. I receives a dilenton pill of which I takes four a day." He also testified that he had some seizures during his present confinement and has "been confined to the hospital there for epileptic seizures" since he has been in jail. He further claimed that he had been under the care of a "psychologist" who had given him tests and electric treatment and had told him he needs further treatment. On cross-examination, he testified that he "had to quit some jobs due to [his] unhealthy seizures."

At the conclusion of defendant's testimony, the trial judge ordered two deputies to guard him, and refused to permit him to handle the water pitcher or glass. "If he wants a drink hand him a paper cup with water in it. Don't let him move out of his seat, otherwise we will handcuff him." [11]

Defense counsel requested a charge to the jury on the question of insanity. The trial judge denied the request "on the ground that sufficient evidence has not been introduced to inject the issue of insanity into the case and to place upon the government the burden of establishing mental competency." The defendant was found guilty as charged and brought before the trial judge for sentencing. When asked if he had anything to say, he responded in an irrational manner.[12]

We think the motion for a mental examination was adequate, and,

10. When asked specifically whether Mrs. Roosevelt was the present first lady, he said that she was.

11. This exchange occurred out of the hearing of the jury, and is mentioned as indicating that the trial judge regarded the accused as dangerous, or at least unpredictable in his behavior.

12. Immediately after sentencing, the trial judge noted that the defendant was awaiting a mental examination which had been ordered by a different judge in connection with another charge, and advised counsel as follows: "Now, Mr. Nelson, Judge Youngdahl signed his commitment for a mental examination to St. Elizabeths Hospital not being aware of the pendency of this sentence. If he goes back [*sic*] to St. Elizabeths Hospital, of course, the period at St. Elizabeths won't be credited to his sentence because the sentence does not begin to run until he is committed for serving it. Now, if you want to save

considering the circumstances, timely.[13] Its denial was therefore error.

Section 24–301 of the District of Columbia Code provides that at any time after arrest and before sentencing "the court may order a mental examination" whenever "it shall appear to the court from the court's own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or is mentally incompetent [to stand trial]." Here, the requests for examination were made before trial and were supported by uncontroverted allegations that defendant suffered from delusions, epilepsy and exhibited unexplained and repeated criminal behavior.

 The requirement of prima facie evidence must be read in the light of the limited purposes of the requested examination.[14] A chief purpose is to get evidence on whether the accused is or is not competent to stand trial. Another purpose is to get evidence on whether,

if there is a trial, the jury should be instructed on insanity and criminal responsibility. It cannot reasonably be supposed that Congress intended to require the accused to produce, in order to get a mental examination, enough evidence to prove that he is incompetent or irresponsible. That is what the examination itself may, or may not, produce.[15] If the accused already had such evidence, there would be little need for the examination. Less evidence is required for a jury instruction than for a directed verdict. McDonald v. United States, 114 U.S.App.D.C. ——, 312 F.2d 847 (1962). Still less should be required for a mental examination.

Since we hold that a mental examination is required, we do not decide whether the evidence introduced at trial, without the benefit of such examination, was sufficient to require a jury instruction on criminal responsibility.

Reversed and remanded for a new trial.

him this three months you better move to vacate that order of commitment. Otherwise, he will just have the extra three months in St. Elizabeths Hospital before he commences this sentence. It is immaterial to the court * * *. I am perfectly willing to vacate that order if you make that motion * * * it is a question of his saving three months." Defense counsel apparently did not move to vacate Judge Youngdahl's order.

13. The trial judge, of course, has some discretion in denying such motions as not timely. But where, as here, counsel learns of defendant's alleged symptoms on the day the trial was scheduled to begin, a motion submitted at that time cannot be denied as late.

14. The statutory provision for mental examination must also be read in light of our purpose, "not only to protect the rights of the accused, but also to protect

'society's great interest' in hospitalizing the accused, if his [crime] sprang from mental disorder, so that he would not be released—as he would after completion of a prison sentence—without medical assurance that he is not likely to be dangerous to himself or others in the reasonably foreseeable future." Winn v. United States, 106 U.S.App.D.C. 133, 134, 270 F.2d 326, 327 (1959).

15. Consider, for example, defendant's allegation that he suffered from epilepsy—an allegation which may be entirely frivolous but which, for the purpose of the motion for an examination, must be accepted as true, since it was not controverted. It may be, as the trial judge stated, that not all epileptics are insane. But as he also recognized, it does not follow that none are insane. An examination was required to establish the nature, extent and effects of the defendant's alleged affliction.