**UNITED STATES of America**

v.

**Gilbert M. MORGAN, Appellant.**

**No. 72–1639.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1973.

Decided Aug. 7, 1973.

As Amended Aug. 14, 1973.

Sheldon I. Cohen, Washington, D. C., with whom Herbert M. Silverberg, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

David G. Larimer, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Herbert B. Hoffman, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and VAN PELT,* Senior United States District Judge, for the District of Nebraska.

BAZELON, Chief Judge:

Appellant pled guilty to three counts of first degree murder, one count of assault on a member of the police force with a dangerous weapon, and one count of carrying a dangerous weapon. He appeals the denial of his motion to withdraw the pleas before imposition of sentence. We find the record inadequate for proper consideration of the district court's reasons for denying appellant's motion; hence we remand with directions for its supplementation.[1]

I

On June 9, 1971 Morgan shot and killed his seventeen year old wife, his seven month old daughter, and his mother-in-law. At some point during the altercation he telephoned the police and reported one of the deaths. When the officers arrived, Morgan threatened one of them with a pistol and retreated into the house, then returned and surrendered.[2]

After his arrest he was taken before a United States Magistrate who ordered him committed to the District of Columbia Jail, with the notation "MPDC HAS ADVISED—DEF. HAS SUICIDAL TENDENCIES."[3] In a second order, the Magistrate commanded that Morgan be examined by a psychiatrist and that the results be reported back by June 18, the date set for the preliminary hearing.[4]

Immediately upon his arrival at the District of Columbia Jail he was examined by medical personnel and placed in "full restraints" in the jail hospital. The next day a District of Columbia Department of Human Resources staff psychiatrist examined him and recommended to the court that "an extended period of time in a hospital setting be devoted to a more complete psychiatric examination."[5]

At the June 18 preliminary hearing the Magistrate recommitted Morgan to the District of Columbia Jail, noting on the order that the Public Defender counsel "claims no further need for concern about possible suicide by the defendant." The record provides no information about the basis for counsel's claim.

On June 25, "upon motion by the defendant for an examination of the mental competency of the defendant," the district judge ordered Morgan committed to Saint Elizabeths Hospital for a

---

* Sitting by designation pursuant to Title 28 U.S.C. § 294(d).

1. We do not at this time consider any other questions raised by this appeal, including those relating to the Federal Youth Corrections Act, 18 U.S.C. § 5005 et seq. (1970).

2. Because of the complex circumstances and confusing sequence of events revealed by the present record, a chronology of important dates is set forth in an appendix to this opinion at pp. 793–794 *infra*

3. The prosecutor asserted in a letter to Saint Elizabeths, *see* p. 790 *infra*, that several suicide notes were recovered from appellant's apartment and person after his arrest, and that appellant apparently confronted the police in the hope that he

could provoke them into shooting him. Moreover, during his incarceration he also attempted suicide, *see* p. 788 *infra*.

4. *See* 23 D.C.Code § 1303(h)(4) (Supp. V, 1972). Morgan's examination was ordered pursuant to this statute, although it states that *"persons released"* shall be assisted in securing "necessary medical services." [Emphasis supplied.]

5. Five days later the superintendent of the District of Columbia Jail wrote the court:
 In view of subject's possible "suicidal tendencies" as indicated by the court, and the nature of his charge, I am hereby appraising [sic] the court and all interested parties of what my staff and I believe to be a severe need for a period of psychiatric observation in Mr. Morgan's case.

psychiatric examination pursuant to 24 D.C.Code § 301(a) (Supp. V, 1972).[6] The order directed that the examination determine both whether Morgan was competent to stand trial and whether, if the offenses were committed by him, they were the products [7] of "a mental disease or defect which substantially affected his mental or emotional processes and substantially impaired his behavioral controls."[8]

On September 2, 1971, Dr. Strawinsky, the Hospital's acting superintendent reported to the court that Dr. Albert E. Marland, "a qualified psychiatric consultant," had examined appellant, and set forth the following unadorned conclusions: that appellant was competent to stand trial although at the time of the examination he was diagnosed "schizophrenia, chronic undifferentiated type;" and that "on the date of the alleged offense, he was suffering from a mental disease . . . and the alleged offenses if committed by him, were the products of his mental con-

dition." [9] No supporting facts or reasoning were included.

Some time in the week following the filing of this report on September 7, Morgan was returned to the D.C. Jail. Within the same week the court granted defense counsel's uncontested motion to commit appellant to Saint Elizabeths because of "defendant's suicidal tendencies, and recent suicide attempt at the District of Columbia Jail." The record does not reflect whether the suicide attempt was made before or after defendant's initial commitment to Saint Elizabeths. Nor does it reveal any of the circumstances concerning this suicide attempt.

On October 1, in an uncontested hearing, based on Dr. Strawinsky's report of September 2,[10] the court found Morgan competent to stand trial. On the issue of responsibility, however, the United States Attorney informed the court that Dr. Marland wished to withdraw his findings concerning mental illness and

6. If it appears, from the court's "observations or prima facie evidence submitted to it," that an accused "is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him," section 301 authorizes the court to order him committed to a mental hospital for a reasonable period for "examination and observation and for care and treatment if such is necessary." 24 D.C.Code § 301(a) (Supp. V, 1972).

7. This was the relevant inquiry before our decision in United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

8. Although section 301 specifically provides only for determination of competency to stand trial, we have required that the examination also inquire into the mental condition of the defendant at the time of the offense. See Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326 (1959); Mitchell v. United States, 114 U.S.App.D.C. 353, 316 F.2d 354 (1963).

9. The report, in relevant part, read:
 Dr. Albert E. Marland, a qualified psychiatric consultant, recently examined Mr. Morgan and the following de-

terminations were made. Mr. Morgan has been diagnosed as Schizophrenia, Chronic Undifferentiated Type and is competent for trial by virtue of having a rational and factual understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding. Furthermore, on or about June 9, 1971, the date of the alleged offenses, he was suffering from a mental disease which substantially affected his mental and emotional processes and substantially impaired his behavior controls and the alleged offenses, if committed by him, were the products of his mental condition.
 He is receiving Triavil 2–25, three times a day.
 We have on innumerable occasions indicated that such reports, containing unsupported "conclusionary labels," are meaningless for the adversary system. They obfuscate, rather than aid, relevant inquiry. See, e. g., Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967); Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964).

10. See note 9 supra.

"productivity," and engage in further examination. He said:

> I have talked to Dr. Marland himself. He has changed his mind—his opinion, excuse me,—he has changed his opinion in the case from what is stated in the letter to "I don't know," and "I want to defer my opinion pending, first of all, a complete analysis because of the severity of the offenses in this case," which was a triple homicide.

The record does not reveal whether, by the time of this hearing, Dr. Marland or Dr. Strawinsky had notified the court that the original report was to be withdrawn or superseded. It would appear, however, that Dr. Marland continued to examine appellant after he was returned to the Hospital on September 13, although the order to return makes no reference to any further examination. In a letter addressed to the clerk of the district court, dated October 14, 1971, Dr. Marland indicated that he had seen appellant "three additional times" and requested "additional time to study him further." But this letter was not filed with the court until January 31, 1972,[11] ten days after Dr. Marland had filed his second report, in which he found Morgan "without mental disease."[12]

The U.S. Attorney, presumably purporting to speak for Dr. Marland at the October 1 hearing, told the court that Dr. Marland's initial examination "was made without any knowledge of the facts of the case except that which the defendant related;" and that the "examination was made by one psychiatrist, Dr. Marland, who visited the hospital on one or two occasions and who has a very busy schedule." In the very next breath, however, the U.S. Attorney, contradicting himself, said, "His [Marland's] opinion was based upon statements made to him by a psychologist and by examining psychiatrists." Shortly thereafter, still at the October 1 hearing, defense counsel indicated that "another Doctor has spoken with Mr. Morgan at least half a dozen times."[13] This important factual conflict remained unresolved.

Defense counsel then told the court that he had not talked with Dr. Marland and did not "know anything about his withdrawal of his opinions." He added that, if Dr. Marland "withdraws his opinion in response to a telephone call from the United States Attorney, I don't know whether he should be the one that does the further evaluation." The judge responded that he would not "tell Saint Elizabeths who to put on this case" and that:

> I gather that the "once over lightly" deficiency has been recognized and Saint Elizabeths is willing to take him back and do a more thorough job.[14]

Defense counsel advised the court that he knew that other Saint Elizabeths staff personnel had interviewed both appellant and appellant's mother. He then asserted that he thought the first examination "was good" and that he accepted

11. January 31, which was ten days after appellant pled guilty, was also the date of the hearing at which he was ordered to Springfield, see p. 791 *infra*. The record does not indicate who presented Dr. Marland's letter dated Oct. 14 to the Court.

12. The second report itself was dated November 1, 1971, and not filed with the court until January 21, 1972, see notes 15–17 *infra*, and accompanying text.

Between filing his second report on January 21, and his letter dated October 14 on January 31, Dr. Marland wrote still another letter, dated January 25, 1972, addressed to the court, in which he

explained that his "first report" was "a detailed study intended for the hospital file," and that his "last report was the result of careful study of the man and available records." This letter was filed the very day it was dated.

13. The report from Dr. Strawinsky, see note 9 *supra*, nowhere indicates whether anyone else examined Morgan or whether a staff conference was held.

14. The court also indicated that upon re-examination "they [Saint Elizabeths] will probably have a staff conference." The record does not reveal whether such a conference was ever held.

its conclusions. Nevertheless, the court ordered another examination of appellant's mental condition at the time of the offense; the report to be filed within 60 days.

At the conclusion of the October 1 hearing both parties represented to the trial judge that they would transmit further evidence and information in their possession to the Hospital. On October 18, the U.S. Attorney transmitted some such material to Saint Elizabeths, with a copy to Dr. Marland. In addition, the U.S. Attorney set forth in a five page, single-spaced, typewritten letter, the Government's version of appellant's background, the crimes, and the scene of the crimes when the police arrived. The letter concluded:

> As you undoubtedly realize this case is one of major significance and interest and we would specifically request that in light of the serious charges involving the death of three innocent people that a very careful analysis be made both as to the existence of a mental illness and the causal relationship, if any, between any mental illness and these offenses. If you desire any further information, please do not hesitate to call and we will be glad to accommodate any such request as soon as possible.

Although the record is unclear as to the nature of the further communications between the U.S. Attorney's office and the Hospital staff, it does appear that defense counsel heard nothing about the re-examination until December 22, 1971, when the U.S. Attorney informally told him that Dr. Marland might be changing his conclusions. Then on January 10, 1972, the U.S. Attorney handed defense counsel a copy of a letter dated November 1, 1971, which Dr. Marland had addressed to the court.[15] This letter was not filed with the court until January 21, 1972,[16] the date on which the hearing to accept defendant's guilty pleas took place. In this letter Dr. Marland completely reversed his former conclusions and opined that appellant had been without mental disease or defect at the time of the offenses.[17] The letter

15. This report, unlike the original one, *see* note 9 *supra*, was sent by Dr. Marland on personal stationery to the court. Saint Elizabeths filed no report of its own pursuant to the court's re-examination order; and there is no indication that Dr. Marland notified the Hospital that he filed a report.

16. The only reason indicated in the record for the delay is a statement by the court, on January 21, that "Dr. Marland makes some reference to the illness of a secretary that was the cause of the delay."

17. The letter read:
Subsequent to my earlier report, I reread my notes and the indictment and developed some doubts, therefore, I have continued to examine Gilbert Morgan. Upon going over my notes of August 12, 1971, I noted that he denied a previous statement that he was a diabetic but was taking insulin, 5 units, three times a day to kill himself (a rediculous [*sic*] statement) repeating a trivially small dose.

He denied he had trouble with other people, had only one fight, later admitted that he had many fights, developed quite a reputation as a fighter, admitted that he had a bad temper and lost it easily. He early denied memory of the events preceeding and surrounding the killings. First refused to discuss many things stating he didn't remember. He was most uncooperative and then each time I saw him he added a little more information. His early explosive and irratic [*sic*] conduct in terminating the examinations with me was staged. He talked more freely with others. He was reasonably cooperative with Dr. Bauer, psychologist, and Dr. A. White, staff psychiatrist of the Jail. I requested an investigation by the social worker, Miss Cooper. She had no difficulty in getting information that he had told me he couldn't remember.

With me he kept his voice so low it was, at times, inaudible. He gave much information to the ward physician, Dr. Ceasar, and in a joint session with Dr. Ceasar he admitted to me most of the incidents he previously claimed he had forgotten. I do not believe that he had forgotten. I do not believe that he has any loss of memory or amnesia relating to the events of the crime.

While he early had very few close friends he had many acquaintances,

nowhere indicates whether Morgan was administered medication during the time of the second examination as he was during the first one.[18]

Appellant's twenty-second birthday was February 2, 1972. The Federal Youth Corrections Act,[19] which provides for indeterminate sentencing to special rehabilitative programs, is unavailable to those who have passed their twenty-second birthday at the time of conviction or entry of a guilty plea.[20] Since Morgan was approaching twenty-two, and since the expert opinion on the question of appellant's sanity made an insanity defense untenable, his counsel advised him to plead guilty to the full indictment,[21] as the Government insisted. The pleas were filed and accepted on January 21, 1972.

Appellant was committed to the Medical Center for Federal Prisoners at Springfield, Missouri, for evaluation pursuant to section 5010(e) of the Youth Corrections Act.[22] The report from Springfield stated that appellant was suffering from "schizophrenic reaction, chronic undifferentiated type," and

advised against a Youth Corrections Act sentence, in part because of the *severity of Morgan's mental disorders.*[23]

 During appellant's commitment at Springfield his original counsel terminated his employ with the Public Defender Service and a new counsel was assigned. Faced with an unanticipated verification of the initial Saint Elizabeths report, new counsel indicated to the court that she would like to discuss with her client the possibility of withdrawing his guilty pleas. At this point, the following colloquy ensued:

> THE COURT: Do you feel you are in any way bound by the action [former counsel] took since you are employed by the same agency?
>
> [COUNSEL]: Your Honor, I think each of us operates as an independent attorney, paid by the same agency.
>
> THE COURT: [Counsel], you people play that game both ways. You regard yourselves as independent for some purposes, but for other pur-

---

many girl friends with whom he had sexual relations, a long stormy affair with his wife prior to marriage, many fights before and after marriage. He was bitter against his mother-in-law for her interference, and as he admitted the tension was building up for a long time. He had many violent scenes with his wife admitting blows at least four times. Remembers he had brooded and thought about using a gun for some days prior to the final incident. He suspected his wife of having a boy friend and knew she intended to leave him. She had previously done so. This time the furniture had been moved. He consistently denied hallucinations.

Mrs. Harrell, a graduate nurse, reported to me that he has hidden many objects in his room probably to indicate that he might use them in a suicidal attempt.

He regrets his actions in the shooting, has a feeling of guilt and is quite depressed over the situation in which he finds himself. This depression has occurred since the incident.

Otherwise I find him without mental disease now and at the time of the al-

leged crime. He is competent to consult with council [*sic*] in his own defense.

18. *Compare* note 17 *supra, with* note 9 *supra. Cf.* United States v. Bennett, 148 U.S.App.D.C. 364, 460 F.2d 872 (D.C. Cir. 1972).

19. 18 U.S.C. §§ 5005–5026 (1970).

20. *Id.* at § 5009.

21. One count of assault with a dangerous weapon was dropped because it was a lesser included offense to the count of assault on a police officer with a dangerous weapon.

22. 18 U.S.C. § 5010(e) (1970).

23. This report described the investigation, and the facts and reasoning relied upon. It included a full medical and dental report, education and intelligence testing and history, social data sheet, an elaborate test report from a clinical psychologist, a lengthy personal report from the chief psychiatrist, and a full staff report with summaries and recommendations. The full study ran to more than 20 pages and took approximately five weeks.

poses you can't represent co-defendants because you come from the same office.

[COUNSEL]: I think that is true of anybody in a law firm, Your Honor, that he is an independent attorney, but had somebody else in—

THE COURT: But an attorney who is associated with a law firm normally regards himself as being bound by the representations made by other people in the same firm.

[COUNSEL]: Your Honor, I also don't feel that had [former counsel] —or given the fact that [former counsel] entered a plea of guilty on behalf of this defendant that the defendant does not have an opportunity to withdraw that plea under the Federal Rules of Criminal Procedure, Rule 42 [*sic*]. He does have to make a motion to withdraw his pleas, and the basis for this motion is information that was not available to [former counsel] but became available as a result of the 5010(e) study.

THE COURT: I will tell you what you are doing, you are forcing me to impose an absolute rule in the future that no attorneys be permitted to see the 5010(e) report. That rule is in operation for many of the judges. I am never going to let a lawyer see the 5010(e) report. Up until now I have let them do it, but never again.[24]

[COUNSEL]: I think a 5010(e) report should be considered by the Court like a probation report.

THE COURT: You don't see that as a matter of right, let me tell you, and you shouldn't forget it.

\* \* \* \* \* \*

THE COURT: \* \* \*

And I should tell you now that I will deny any motion for a withdrawal of the plea, and you may have your exception.

[COUNSEL]: May I have leave to file one, for the record, Your Honor?

THE COURT: Surely, I assume that this matter will be litigated above and conceivably will take some time.

But I want to state for the record that this is just one more evidence of what I regard as a lack of responsibility on the part of the Legal Aid Agency.[25] A man makes a calculated decision, being fully aware of the possibility of the insanity defense, to plead, and his course of conduct is repudiated by an associate in the same office on the ground that you operate independently and are not bound by the other's representations.

Shortly after this colloquy, at the sentencing hearing, the judge again articulated the same rationale for officially denying appellant's motion to withdraw his pleas. He stated that appellant had made a "tactical choice" to forego an insanity defense and pled guilty so that he could be eligible for sentencing under the more beneficent provisions of the Youth Corrections Act. And that only after his choice did not "pan out" (since the Springfield report recommended an adult sentence) did he deem it unwise.

24. Putting to one side the question of whether and in what circumstances it would be appropriate for the court not to allow defense counsel to see the section 5010(e) report, *cf.* United States v. Bryant, 143 U.S.App.D.C. 53, 442 F.2d 775 (1971), it would be a most unfortunate abuse of discretion to refuse to allow inspection in order to prevent appellant from raising valid defenses.

25. On the contrary, we believe it would clearly have been a lack of responsibility, which would have raised substantial Sixth Amendment questions, for counsel to have done less. *See* United States v. Washington, 154 U.S.App.D.C. 246, 475 F.2d 357 (1973) ; United States v. Benn, 155 U.S.App.D.C. 180, 476 F.2d 1127 (1972). *See generally* Bazelon, The Defective Assistance of Counsel, 42 U.Cin. L.Rev. 1 (1973).

Thus, without giving any consideration to the Springfield report, the court decided to "stand on the record at the time the pleas were taken," and held appellant bound by his "tactical decision." Then, on the basis of the Springfield report, the court denied appellant's request for Youth Corrections Act sentencing and imposed an adult sentence of twenty years to life imprisonment and "directed" that appellant be returned to Springfield "for treatment."

## II

Since the district judge expressly rested his refusal to allow Morgan to withdraw his pleas "on the record at the time the pleas were taken," we limit our present consideration to that record. We find it barren of inquiry into a set of circumstances that cried out for explanation since they bore heavily on the validity of appellant's mental examinations, which, in turn, were decisive in his decision to plead guilty. Such circumstances are instanced by the following events. First, on the representation of the U.S. Attorney, apparently without any word from Saint Elizabeths, the court ordered a re-examination of appellant. Then, a letter from the examining psychiatrist, dated October 14, requesting permission from the court to examine Morgan further, was not filed until January 31, after the guilty pleas were accepted. Next, a letter dated November 1, purporting to be the Hospital's final report, was sent directly by Dr. Marland to the court; moreover, the letter was not filed until January 21, the date the pleas were taken, and almost two months after the date set in the court's re-examination order. Finally, when Dr. Marland submitted a report in direct contradiction to his previous findings, no effort was made to seek an explanation for his change.

26. *Cf.* United States v. Chavis, 155 U.S. App.D.C. 190, 476 F.2d 1137 (1973) (remand for inquiry into adequacy of independent psychiatric examination).

27. Lack of adequate procedures may raise issues of constitutional dimension. *See*

These matters raise serious unanswered questions about whether appellant's decision to plead was materially affected by any of the following:

(1) defense counsel's failure to seek an independent mental examination, or to interview Dr. Marland or call him to testify;[26]

(2) the influence of ex parte representations or contacts between the U.S. Attorney or other Government officials and the examining staff at Saint Elizabeths;

(3) Dr. Marland's failure to file promptly his letters;

(4) the court's decision to order a re-examination solely on the representation of the U.S. Attorney;

(5) the court's failure to inquire into the questionable circumstances surrounding the examinations it had ordered.

Sound principles of judicial administration require that we await clarification of these matters, and others that may surface in the wake of their clarification—such as the presence or absence of rules, regulations and procedures designed to safeguard the integrity of the mental examination[27]—before deciding whether the court below properly limited itself to, and properly appraised, the record before it at the time appellant filed his pleas. Accordingly, we remand the record for a thorough hearing in order to fill the lacunae which now exist.

Record remanded for supplementation.

APPENDIX 1: Chronology of Important Dates

1. June 9, 1971—Date of Offense.

2. June 25, 1971—Defendant ordered to St. Elizabeths for 60 days pursuant to section 301(a).

Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969). *See also* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

3. Sept. 2, 1971—Date of letter from Dr. Strawinsky, Acting Superintendent of St. Elizabeths, to court, regarding Dr. Marland's findings of mental illness and productivity. Filed with court Sept. 7, 1971.

4. Sept. 13, 1971—Defendant ordered returned to St. Elizabeths because of mental illness, suicidal tendencies and suicide attempt.

5. Oct. 1, 1971—Competency hearing. Order issued for re-examination on question of criminal responsibility; issued before Dr. Marland's letter indicating need for additional observation filed with court (see Nos. 6 & 13).

6. Oct. 14, 1971—Date of letter from Dr. Marland to the court expressing his desire for additional observation. Filed with court Jan. 31, 1972 (see No. 13).

7. Oct. 18, 1971—Date of letter from U.S. Attorney to St. Elizabeths (copy to Dr. Marland) describing defendant's background and events surrounding the offense.

8. Nov. 1, 1971—Date of letter from Dr. Marland to the court describing his final conclusion of no mental illness at the time of the offense.

Filed with court Jan. 21, 1972 (see No. 11); given to defense counsel by U.S. Attorney Jan. 10, 1972 (see No. 10).

9. Dec. 22, 1971—Defense counsel told informally by U.S. Attorney that Dr. Marland planned to reverse his conclusions.

10. Jan. 10, 1972—Dr. Marland's letter dated Nov. 1, 1971 (No. 8), given by U.S. Attorney to defense counsel.

11. Jan. 21, 1972—Hearing to take guilty pleas. Dr. Marland's letter dated Nov. 1, 1971 (No. 8), filed with court.

12. Jan. 25, 1972—Date of letter from Dr. Marland to trial judge explaining that his second report (No. 8), not his first report (No. 3), was intended for court use. Filed with the court Jan. 25, 1972.

13. Jan. 31, 1972—Hearing at which defendant ordered to Springfield for evaluation pursuant to Youth Corrections Act. Dr. Marland's letter dated Oct. 14, 1971 (No. 6), filed with the court.

14. May 22, 1972—Defendant's motion to withdraw guilty pleas denied. Defendant sentenced as an adult offender.