UNITED STATES of America

v.

Roland R. HENRY, Appellant.

No. 75–1223.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1975.

Decided Jan. 19, 1976.

John A. Shorter, Jr., Washington, D. C., for appellant; Bernadette Gartrell, Washington, D. C., was on the brief for appellant.

Joseph Guerrieri, Jr., Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Concurring statement filed by Circuit Judge WILKEY.

J. SKELLY WRIGHT, Circuit Judge:

On their way to search appellant Roland Henry's apartment for an escaped fugitive believed to be hiding there, police officers spotted Henry sitting in a parked car near his residence. As the officers approached the car, which had been driven by Jacqueline Barnes Smith[1] and in which Henry was a passenger, two of them noticed appellant move toward and then back from the glove compartment. A search of the glove compartment[2] revealed a vial containing cocaine and a folded dollar bill containing a heroin mixture. The officers also recovered a gun from Mrs. Smith's purse. On the basis of these

discoveries and of Mrs. Smith's statement that the gun belonged to Henry, who had asked her to hold it, appellant was charged[3] with purchasing narcotic drugs not in the original stamped package (the heroin),[4] receipt and concealment of a narcotic drug with knowledge that the drug had been illegally imported (the heroin),[5] carrying a dangerous weapon,[6] and unlawful possession of a narcotic drug (the cocaine).[7] Henry was acquitted of the dangerous weapon charge and convicted on all the narcotics charges. In this appeal he challenges two aspects of the proceeding below. Evaluating those challenges requires us to describe the trial in some detail.

## I. The Trial

The trial resulting in the present appeal began August 28, 1972. The first order of business[8] was the disposition of the defense's pretrial motion requesting that appellant be committed for a mental examination pursuant to 24 D.C.Code § 301(a) (1973).[9] That motion had been filed June 26 and was denied the same day because of the risk that the defendant would flee the jurisdiction.[10] How-

1. Mrs. Smith was married between the time of the events described in text and the time of the trial. For the sake of clarity she will be referred to as Mrs. Smith throughout this opinion.

2. No Fourth Amendment issue is involved in this appeal, and we therefore do not detail the sequence of events leading to the search.

3. The original indictment charged appellant with two counts of purchasing narcotics not in the original stamped package. One count was based on the heroin and the other on the cocaine. This indictment was superseded by an information filed Aug. 30, 1972 which charged possession of the cocaine under District of Columbia law. See Government brief at 1 & n.1; note 7 infra.

4. 26 U.S.C. § 4704(a) (1964), repealed, Pub.L. No. 91–513, § 1101(b)(3)(A), 84 Stat. 1292 (1970).

5. 21 U.S.C. § 174 (1964), repealed, Pub.L. No. 91–513, § 1101(a)(2), 84 Stat. 1291 (1970).

6. 22 D.C.Code § 3204 (1973).

7. 33 D.C.Code § 424 (1973).

8. Appellant's motion requesting the trial judge to disqualify himself was summarily denied.

9. 24 D.C.Code § 301(a) (1973) provides, in pertinent part, as follows:

> If it appears to a court having jurisdiction of—
>
> (1) a person arrested or indicted for, or charged by information with, an offense, * * *
>
> * * * * * *
>
> that, from the court's own observations or from prima facie evidence submitted to it and prior to the imposition of sentence, the expiration of any period of probation, or the hearing on the transfer motion, as the case may be, such person * * * is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense, the court may order the accused committed to the District of Columbia General Hospital or other mental hospital designated by the court, for such reasonable period as the court may determine for examination and observation and for care and treatment if such is necessary by the psychiatric staff of said hospital. * * *

10. The case originally came to trial on Aug. 23, 1971. Most of that day was consumed by

ever, the District Court did order St. Elizabeth's Hospital to examine the defendant in the D.C. Jail. Between the time that order was entered and the time of trial, defense counsel had received only [11] a copy of a letter from St. Elizabeth's, dated July 11, asking the court to relieve it of responsibility for examining Henry on the ground that the hospital was not staffed to perform outpatient examinations.

As the story unfolded in the courtroom, defense counsel learned that the June 26 motion for an examination had been responsible for a number of actions. Following receipt of the letter from St. Elizabeth's, the court on July 14 ordered the Forensic Psychiatry Office to examine Henry in the D.C. Jail. That examination was conducted by Dr. Irwin Papish, a psychiatrist, on July 27. By letter dated August 3 and filed August 11, Dr. Papish informed the court that

> it is my opinion that there is doubt as to the competency of the defendant as well as the likelihood of the presence of a mental illness. Given his response to the interview, it is my recommendation that he be hospitalized for more extensive mental observation in order to more adequately determine the status of his competency and the presence of a mental illness.

Henry's counsel did not receive a copy of this letter until he arrived at court the morning of the trial.

The trial judge considered Dr. Papish's report "unsatisfactory" and therefore ordered that Henry be examined by another psychiatrist. Trial Tr. at 7, 10. When Dr. Denis Kennedy, who conducted the second examination, requested

that Henry be given psychological tests, the court issued another order directing Dr. Carl Bauer to administer appropriate tests and report to Dr. Kennedy and the court. These orders were entered in the docket on August 18 and August 24, and the defense did not know either that the orders had been issued or what the doctors had found until the morning of the trial. The written report of Dr. Bauer's examination did not arrive at the court until approximately 2:00 P.M. on August 28, almost four hours after the hearing had begun. Trial Tr. at 50. Dr. Kennedy's written report was not filed until August 29.[12]

The Assistant United States Attorney, on the other hand, was not only informed about what transpired but had apparently played an active role in dealing with the doctors. Thus the prosecutor asked Dr. Kennedy to examine appellant on August 17 or 18, Trial Tr. at 74, prior to or on the day the order for an examination was entered and two or three days before Dr. Kennedy received a copy of the order. Trial Tr. at 73. Information supplied to Dr. Kennedy by the prosecutor formed part of the basis for the doctor's diagnosis of Henry's mental condition. Trial Tr. at 79–81. Dr. Bauer was aware that Dr. Kennedy had been contacted by the United States Attorney, Trial Tr. at 37, and both doctors had told the prosecutor of the results of their examination before the trial began.

Henry's counsel protested vigorously that the lack of notice to the defense and the unavailability of written reports even on the day of trial deprived the defense of the opportunity to challenge

---

a hearing on a motion to suppress, but 10 jurors were also selected before the proceeding was recessed until the next day. On the following day, however, Henry failed to appear and the jury was dismissed. Henry resurfaced on Nov. 1, 1972 when he was arrested in Albuquerque, New Mexico and again charged with narcotics and weapons violations. Following his conviction on the New Mexico charges, appellant was returned to the District of Columbia pursuant to a writ of *habeas corpus ad prosequendum.*

11. There is some suggestion in the record that the trial judge's secretary may have told Henry's counsel about the activity described in the following paragraphs of text during a telephone conversation four days before the trial. *Compare* Trial Tr. at 7 *with id.* at 70.

12. The order appointing Dr. Kennedy to conduct the examination required him to report to the court "no later than August 24, 1972."

the doctors' findings and to prepare an insanity defense. *E. g.*, Trial Tr. at 5–9, 15–18, 67, 71, 138. The District Court attempted to meet these objections by allowing the defense to conduct a lengthy examination of Drs. Kennedy and Bauer. At the conclusion of this examination the defense conceded that Henry was competent to stand trial, but maintained that the in-court examination of the doctors was not an adequate substitute for pretrial time to investigate and prepare an insanity defense. Trial Tr. at 136–138.

Following the hearing the jury returned to the courtroom, at 4:55 P.M., and the trial began. The trial continued until after 6:00 P.M. on August 28 and consumed the next two full days. On August 31 the jury was charged and returned its verdict.

During trial the Government presented three witnesses who tied the seized items to Henry. The principal witness was Mrs. Smith, who testified that Henry had put the gun in her purse, that he had been using cocaine while they were driving, that the heroin was not hers, that she never used narcotics, and that she had seen appellant move forward when the officers approached the car. She also said that the glove compartment had opened and closed at that time, although it was too dark for her actually to see Henry open it. Her testimony was somewhat corroborated by the two police officers who had seen Henry move toward the glove compartment. In addition to this evidence, the Government brought Henry's flight from his first trial to the jury's attention.[13]

The defense responded with three witnesses. The first defense witness testified that although Mrs. Smith had discussed her arrest with the witness immediately following the event, Mrs. Smith never said that the gun was not hers. The second witness contradicted the testimony that Mrs. Smith never used any narcotics, including cocaine. Finally, appellant took the stand in his own defense. He testified that he had never seen the gun or the heroin before, and that the cocaine belonged to Mrs. Smith, who had been using it. Henry also admitted on direct examination that he had been convicted of possessing counterfeit bills in 1965 or 1966, and that he had "suffered another felony conviction [in New Mexico] that is not final at this point[.]" Trial Tr. at 495.

The Government subjected appellant to a rigorous cross-examination, during which Henry's New Mexico convictions were again brought to the jury's attention. The first time this occurred was during the prosecutor's attempt to shake appellant's testimony that the cocaine belonged to Mrs. Smith:

Q. Did you ever see her buy it [cocaine] at any time during your relationship?

A. No. I've never seen her buy it.

Q. I see. And who supplied the narcotics to her?

A. Now that I don't know.

Q. Did you?

A. Me? No. No, I didn't supply it to her.

Q. You never supplied it to her?

A. No.

Q. Is it not true that Roland R. Henry was convicted on February 1st, 1972, in the Federal District Court at Albuquerque, New Mexico, for possession of cocaine with intent to distribute cocaine?

Trial Tr. at 538–539. Defense counsel objected strongly to this use of the prior conviction. Shortly after this exchange the prosecutor began asking appellant about heroin:

Q. Did you ever see her [Mrs. Smith] with any heroin?

A. No.

* * * * * *

Q. Have you ever seen heroin?

A. Yes. I have seen it.

Q. Where have you seen it?

---

**13.** *See* note 10 *supra.*

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: I will sustain the objection.

Go ahead, [prosecutor].

BY [THE PROSECUTOR]:

Q. How many times have you seen it, Mr. Henry?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: I will sustain the objection.

BY [THE PROSECUTOR]:

Q. Mr. Henry, are you the same Roland R. Henry that was convicted in the Federal District of New Mexico, specifically Albuquerque, New Mexico, on February 1st, 1972—

[DEFENSE COUNSEL]: Objection, Your Honor. * * *

* * * * * *

THE COURT: I am going to permit it. I think it is perfectly proper.

Q. (cont.)—of possession of heroin with intent to distribute it?

*Id.* at 541–542. The prosecutor then attempted to introduce Henry's New Mexico conviction of possession of a pistol, but the court ruled that he had "gone far enough." *Id.* at 566.

## II. The Mental Examination

It is well established in this jurisdiction that pretrial mental examinations have a dual purpose. Their most immediate function, of course, is to assist the court in determining whether the defendant is competent to stand trial. In addition, the pretrial examination serves to inform all participants in the trial of the applicability of the insanity defense. *See United States v. Morgan*, 157 U.S. App.D.C. 197, 199 n.8, 482 F.2d 786, 788 n.8 (1973); *Mitchell v. United States*, 114 U.S.App.D.C. 353, 359, 316 F.2d 354, 360 (1963); *Winn v. United States*, 106 U.S. App.D.C. 133, 134–135, 270 F.2d 326, 327–328 (1959), *cert. denied*, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961). The District Court recognized this second purpose in its orders, which required the examining doctors to determine appellant's mental condition at the time of the events for which he was facing trial.

■ As the orders were implemented, however, the second purpose of the pretrial examination was not served. The prosecution, apparently, received information about the doctors' findings in time to determine whether further investigation or preparation was required, but the defense did not.[14] The lengthy inquiry allowed by the District Court on the first day of the trial adequately ventilated the question of Henry's competence to stand trial,[15] but it did not provide the defense with time in which to analyze the doctors' reports.[16] And the three consecutive full days occupied by Henry's trial involved no lull during which counsel might have prepared an insanity defense.

■ In addition to arguing that the defense had an adequate opportunity to consider raising the insanity question during the trial, the Government con-

---

**14.** We have previously expressed concern about both a prosecutor's *ex parte* contacts with psychiatrists appointed to examine defendants and the failure of examining doctors to file their reports promptly. *See United States v. Morgan*, 157 U.S.App.D.C. 197, 204, 482 F.2d 786, 793 (1973), *after remand*, 160 U.S.App.D.C. 278, 280, 491 F.2d 71, 73 (1974). Such occurrences must be eliminated since "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), *quoting Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

**15.** The dialogue between defense counsel and the trial judge suggests that on Aug. 28 the District Court was focusing only on the first purpose of the pretrial examination. *See* Trial Tr. at 136–138.

**16.** At one point defense counsel asked that he be allowed to "get a book and read a few pages of it concerning these particular diagnoses" before cross-examining Dr. Kennedy. This request was denied. Trial Tr. at 70. The transcript is replete with passages that indicate the difficulty of dealing with psychiatric testimony without prior research. *See, e. g.*, Trial Tr. at 39, 67–68, 128–131.

tends that appellant's failure to raise that issue must be viewed as a tactical choice. Moreover, the Government urges that we disregard any error that might have been made in the handling of the mental examinations on the ground that Henry had no valid insanity defense available to him. Government brief at 20–21.

We cannot accept either argument. As indicated above, appellant's counsel simply had no opportunity between the time he learned of the results of the mental examinations and the end of the trial during which he might have developed information not reviewed at the August 28 hearing.[17] In these circumstances, to hold that the defense "chose" not to present an insanity defense would further distort our already tortured language.

The suggestion that any error was harmless has two fundamental defects. First, the record does contain some indication that defense counsel might have been able to develop a viable insanity defense.[18] The more fundamental flaw in the Government's argument, however, is that the very bareness of the record may indicate only the importance of the error in the conduct of the proceedings. When the complaint is that appellant was deprived of his rightful opportunity to prepare a defense, the Government cannot take comfort from the fact that no defense was prepared.

### III. The Cross-Examination of Henry

The prosecutor's use of Henry's New Mexico convictions is remarkably similar to the questioning which formed the basis for the appeal in this court's recent case of *United States v. Carter*, 157 U.S. App.D.C. 149, 482 F.2d 738 (1973). The crucial questioning in *Carter* follows:

Q. [The Assistant United States Attorney]: And you wouldn't rob that man, right? A. I had no reason to rob when I am working.

Q. You wouldn't do something like that? A. No, I wouldn't.

Q. But in 1968, you were convicted of six counts of robbery and assault with a dangerous weapon, weren't you, on three different people? A. Yes, I was, and I have learned my lesson from that.

Q. You did? A. Right.

157 U.S.App.D.C. at 151, 482 F.2d at 740. After examining the considerations which underlie the rule allowing admission of evidence of prior convictions only for the carefully limited purpose of impeaching a defendant's credibility, we reversed Carter's conviction because the questioning quoted above was impermissible. There is no reason to recanvass the concerns examined in *Carter*. We therefore confine our inquiry to determining whether *Carter* governs this appeal.

■ The Government offers three grounds for distinguishing *Carter* from the present appeal. First, the Government maintains that "by veiling a series of convictions in New Mexico by a vague reference to a single unspecified felony conviction, appellant opened the door to the prosecutor's cross-examination on the matter." Government brief at 15. This argument, however, suggests only that the prosecutor might have been entitled, at some point in his cross-examination, to bring out that Henry had been convicted on several felony counts in New

---

**17.** The defense might have called Dr. Papish as a witness during the trial. *See* Government brief at 20. Since Dr. Papish's doubts concerning appellant's mental condition were only revealed to the defense on the day the trial started, however, the defense had no opportunity to ask Dr. Papish to spend more time with appellant. In the absence of further examination, the doctor's testimony would presumably

simply have explained his conclusion that further examination was necessary to determine appellant's mental state at the time of the offense.

**18.** Dr. Papish's letter, *see,* 174 U.S.App.D.C. p. ——, 528 F.2d at 663, *supra*, is the principal evidence that it might have been possible to develop an insanity defense. *See also* Trial Tr. at 117–133.

Mexico,[19] and perhaps even that most of those counts involved narcotics.[20] The problem with the questioning which actually occurred is the same as it was in *Carter*: the manner in which the prosecutor asked his questions was improperly designed to suggest to the jury that prior guilt was a basis for inferring guilt of the crimes for which the defendant was then on trial.

Second, the Government argues that in *Carter*, unlike here, the prosecutor prefaced his use of the prior conviction with questions calling for the defendant to admit that he had committed the crime being tried. Government brief at 15–16. In this case, however, the single contested issue was whether the contraband discovered in the car belonged to appellant or to Mrs. Smith. When appellant denied that he had supplied Mrs. Smith with cocaine, the prosecutor asked if he had been convicted of possession of cocaine with intent to distribute.[21] This sequence is indistinguishable from asking a robbery defendant, "You wouldn't do something like that?" and then introducing evidence of a prior robbery conviction.

As its final basis for distinguishing *Carter*, the Government contends that Henry's attempt to evade admitting his prior convictions (by questioning whether he had been convicted of possession with intent to distribute rather than of simple possession) "unwittingly focused the jury's attention on his credibility, or the lack thereof." Government brief at 16. This may well be true. But the problem identified by *Carter*, and present here, is that the sequence of questions invited the jury to consider the prior convictions as more than evidence relating to the defendant's credibility. The concern is not that the defendant's credibility was unfairly attacked, but that the prior convictions were used to suggest guilt. The Government's third ground of distinction, like its first, does not address this concern.[22]

We therefore conclude that *Carter* governs this appeal and that the

---

**19.** In the discretion of the trial judge, multiple convictions may be admitted if they bear on credibility. *See, e. g., Gordon v. United States*, 127 U.S.App.D.C. 343, 345 n.2a, 383 F.2d 936, 938 n.2a (1967). The District Court's discretion must be guided by the factors set forth in *Gordon* and in *Luck v. United States*, 121 U.S. App.D.C. 151, 348 F.2d 763 (1965).

**20.** *See United States v. McIntosh*, 138 U.S. App.D.C. 237, 426 F.2d 1231 (1970). We note, however, that

> [w]here multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe that "if he did it before he probably did so this time." As a general guide, those convictions which are for the same crime should be admitted sparingly; one solution might well be that discretion be exercised to limit the impeachment by way of a similar crime to a single conviction and then only when the circumstances indicate strong reasons for disclosure, and where the conviction directly relates to veracity.

*Gordon v. United States, supra* note 19, 127 U.S.App.D.C. at 347, 383 F.2d at 940 (Burger, J.).

**21.** Setting aside the high likelihood that the jury would draw an improper inference based on the prior conviction, it might be possible to argue that the sequence of questioning constituted the most logical manner of attacking appellant's credibility. The fact that appellant was convicted of possession of cocaine with intent to distribute does weaken his denial that he ever gave cocaine to Mrs. Smith. Even this rationale is not available, however, to support the questioning concerning the heroin conviction. *See* 174 U.S.App.D.C. at ——, 528 F.2d at 664 *supra*. The prosecutor obviously did not introduce appellant's prior heroin conviction to undermine his admission that he had seen heroin. Rather, the context indicates that the prosecutor introduced the prior conviction as a substitute for his two previous questions which asked Henry to explain the circumstances of his familiarity with the drug. Those two questions had been objected to by Henry's counsel, and the objections had been sustained.

**22.** Footnote 17 of the Government's brief appears to concede the weakness of the attempt to distinguish *Carter*:

> In addition, the instant case was tried before the *Carter* case was decided by this Court. It may well be that the prosecutor, if he had had the benefit of the *Carter* decision, would have posed his questions somewhat differently to avoid the error which the prosecutor in *Carter* was held to have committed.

District Court committed error when it allowed the prosecutor to utilize appellant's prior convictions in the manner set forth above. The Government urges us to conclude that this error was cured by the cautionary instruction given in the course of the court's charge to the jury. Government brief at 17. *Carter*, however, held that both a limiting instruction immediately following the impermissible questioning and a cautionary instruction during the final charge were insufficient to eliminate the possibility of prejudice to the defendant. *A fortiori*, we cannot hold that the instruction in this case cured the error.

■ Finally, the Government suggests that in view of the evidence against appellant, any error was harmless. Government brief at 18. We do not agree that the case against Henry was so strong as to render the cross-examination insignificant. The principal issues in the trial were posed by the conflict between Mrs. Smith's testimony, partially corroborated by two witnesses, and appellant's testimony, also partially corroborated by two witnesses. In addition to these witnesses, the prosecution's evidence of Henry's guilt consisted of Henry's flight from the jurisdiction and the impermissible inference which the jury might have drawn from the prior convictions. This evidence is not so overwhelming that "we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"[23] *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969), *quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

### IV.  Conclusion

Both the belated revelation of the results of the pretrial mental examinations and the prosecutor's use of Henry's prior convictions involved error affecting substantial rights of the appellant. For these reasons, the judgment of conviction entered by the District Court must be, and hereby is,

*Reversed.*

WILKEY, Circuit Judge (concurring).

I concur in Parts I and II of the court's opinion, and in the result that the case must be reversed and remanded for a new trial.

---

**23.** Our inability to conclude that the error was harmless is increased by the actual disposition in this case. The prosecutor was allowed to use evidence of Henry's narcotics convictions during his cross-examination about the narcotics counts, and appellant was convicted of those counts. The prosecutor attempted to use Henry's New Mexico conviction of possession of a gun in the same way, but the court prevented his doing so. Appellant was acquitted of the gun charge. These results do not prove that the prior conviction questioning was determinative, but they do show that the jury was unwilling to rest a verdict solely on Mrs. Smith's testimony. Thus the other evidence, which consisted solely of the two officers' sighting of Henry's movement toward and from the glove compartment, Henry's flight, and the prior convictions, was all-important.